**UNITED STATES NUCLEAR REGULA-TORY COMMISSION and United States of America, Plaintiffs,**

v.

**RADIATION TECHNOLOGY, INC., Defendant.**

Civ. A. No. 80–2187.

United States District Court,
D. New Jersey.

Aug. 6, 1981.

William W. Robertson, U. S. Atty. by Louis J. Bizzarri, Asst. U. S. Atty., Newark, N. J., for plaintiffs.

G. Martin Meyers, Denville, N. J., for defendant.

## OPINION

MEANOR, District Judge.

### I. INTRODUCTION

On July 15, 1980, the United States Nuclear Regulatory Commission (hereinafter referred to as "NRC", "Commission" or "AEC"[1]), through the Attorney General, brought suit, pursuant to section 234(c) of the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2282(c), to collect penalties amounting to $4050 imposed upon Radiation Technology, Inc. (hereinafter referred to as "RTI"), for alleged violations of certain agency regulations and license conditions. The matter is presently before the court on both parties' motions for summary judgment. Since this case presents several issues heretofore unresolved by any federal court,[2] I reserved decision after oral argument on the motions so as to render a

---

1. The NRC is now exercising certain of the powers formerly exercised by the Atomic Energy Commission ("AEC"). 42 U.S.C. § 5841(f).

2. In its initial brief in support of summary judgment, plaintiffs indicate that "to date, collection of a civil penalty imposed by the Commission has not required judicial assistance. Accordingly, the role of the district court in such actions is a question of first impression." NRC's Brief at 15. At oral argument, both parties conceded that no opinion is reported which addresses the issues presently before the court. The court has not been able to locate any decision on point.

formal opinion on these issues of national importance. These issues concern the jurisdiction of the district court to entertain this action as well as the scope of judicial review to be employed if the action is properly before a district court. For the reasons set forth below, I hold that the district court does have jurisdiction over this action. I also hold that in a section 234(c) collection action the defendant is entitled to a trial *de novo.* However, since both parties have moved for summary judgment, a review of the administrative record and the affidavit submitted by plaintiff, persuades me that no trial is necessary in the instant matter. I will grant the NRC's motion and enter an order directing the defendant to pay certain of the assessed penalties.

## II. FACTS AND PROCEDURAL HISTORY

The Atomic Energy Act of 1954, as amended, (hereinafter referred to as the "Act") gave the AEC authority, *inter alia,* to regulate nuclear power. Included within this grant of authority was responsibility for licensing and regulating the possession and use of "byproduct material", *i. e.,* radioactive materials used in industrial applications, medical diagnosis and treatment and applied research and development. 42 U.S.C. §§ 2014(e), 2111. To effectuate the purposes of the Act, the AEC was authorized to promulgate "standards and instructions to govern the possession and use of ... byproduct materials." 42 U.S.C. § 2201(b). The Commission exercised this authority and promulgated a variety of regulations.

The possession and use of byproduct material is authorized in most circumstances only under license from the Commission. 42 U.S.C. § 2111. Byproduct material licensees are subject to the provisions of the Act and the general rules, regulations and orders of the Commission, as well as any license-specific terms and conditions imposed on the licensee by the Commission. 42 U.S.C. § 2233; 10 C.F.R. § 30.34. The Commission attempts to monitor compliance by the licensees through a system of re-quired tests, licensee reports, record-keeping requirements and on-site inspections by Commission representatives. 10 C.F.R. § 30.34(e)(4).

Once a transgression has occurred, the Commission is authorized to take certain actions against the licensee. Depending upon the severity of the transgression, the Commission may invoke any number of sanctions. These include: (1) the issuance of a Notice of Violation, 10 C.F.R. § 2.201; (2) the imposition of civil penalties, 10 C.F.R. § 30.63; (3) the issuance of an order modifying, suspending or revoking the license, 10 C.F.R. §§ 2.202, 2.204; and/or (4) the withholding or recalling of the byproduct material, 10 C.F.R. § 30.62. Where necessary or appropriate, the Commission may seek judicial assistance to collect a penalty, 42 U.S.C. § 2282(c), or obtain an injunction, 42 U.S.C. § 2280. Finally, where violations are willful the Commission may seek criminal sanctions of up to $5000, two years imprisonment, or both. 42 U.S.C. § 2273.

### A. *Imposition of Civil Penalties.*

The Act provides that any person who violates an applicable statutory provision, regulatory requirement or license condition of any material byproduct license is subject to a civil penalty of up to $5000 for each violation. The Act also mandates certain procedures be utilized by the Commission for the valid exercise of this authority. Additionally, the Act empowers the Commission to institute a civil action to collect the penalty imposed. Specifically, section 234 of the Act states:

(a) Any person who (1) violates any licensing provision of section 2073, 2077, 2092, 2093, 2111, 2112, 2131, 2133, 2134, 2137, or 2139 of this title or any rule, regulation, or order issued thereunder, or any term, condition, or limitation of any license issued thereunder, or (2) commits any violation for which a license may be revoked under section 2236 of this title, shall be subject to a civil penalty, to be imposed by the Commission, of not to exceed $5,000 for each such violation: *Provided,* That in no event shall the total

penalty payable by any person exceed $25,000 for all violations by such person occurring within any period of thirty consecutive days. If any violation is a continuing one, each day of such violation shall constitute a separate violation for the purpose of computing the applicable civil penalty. The Commission shall have the power to compromise, mitigate, or remit such penalties.

(b) Whenever the Commission has reason to believe that a person has become subject to the imposition of a civil penalty under the provisions of this section, it shall notify such person in writing (1) setting forth the date, facts, and nature of each act or omission with which the person is charged, (2) specifically identifying the particular provision or provisions of the section, rule, regulation, order, or license involved in the violation, and (3) advising of each penalty which the Commission proposes to impose and its amount. Such written notice shall be sent by registered or certified mail by the Commission to the last known address of such person. The person so notified shall be granted an opportunity to show in writing, within such reasonable period as the Commission shall by regulation prescribe, why such penalty should not be imposed. The notice shall also advise such person that upon failure to pay the civil penalty subsequently determined by the Commission, if any, the penalty may be collected by civil action.

(c) On the request of the Commission, the Attorney General is authorized to institute a civil action to collect a penalty imposed pursuant to this section. The Attorney General shall have the exclusive power to compromise, mitigate, or remit such civil penalties as are referred to him for collection.

42 U.S.C. § 2282 (amended in 1980).

The procedure actually adopted by the Commission for administrative imposition civil penalties goes beyond the requirements of the statute. The Commission provides an opportunity for a full adjudicatory consideration of all relevant facts prior to the imposition of any penalty. 10 C.F.R.

§ 2.205. The licensee is advised in writing of all the following elements of the alleged violation: (1) the dates, facts and nature of each alleged item of noncompliance; (2) the specific statutory provision, regulatory requirement or license condition alleged to have been violated; and (3) the amount of the proposed penalty. The licensee is also apprised of its right to respond in writing to the notice and provide any information it deems relevant. If the licensee avails itself of this opportunity, the Director of the Office of Inspection and Enforcement (Director) is to consider the response before imposing, mitigating, remitting or dismissing the penalty. If the licensee remains dissatisfied with the Director's response, it may request a hearing before the Commission or the Commission's designee. As a rule of practice, the hearing is before an administrative law judge (ALJ), 10 C.F.R. § 2.704(a), with the licensee afforded the full panoply of rights required under the Administrative Procedure Act, 5 U.S.C. § 554. 10 C.F.R. § 2.700 *et seq.* Appeals from the initial decision of the ALJ may be taken as of right to an Atomic Safety and Licensing Appeal Board (Appeal Board), the Commission's designee in matters involving, *inter alia*, civil penalties. 10 C.F.R. § 2.785(a). Finally, if the decision of the Appeal Board is erroneous with respect to an important question of fact, law or policy, the Commission will review the matter on its own motion or upon a petition of a party. 10 C.F.R. § 2.786. Upon the exhaustion of these administrative procedures and upon the expiration of ten days from the date of service of notice of final Commission action, the Commission is authorized to refer the matter to the Attorney General for collection. 42 U.S.C. § 2282(c); 10 C.F.R. § 2.205(h).

**B.** *Procedures Employed Against RTI.*

At all relevant times, RTI was the holder of Byproduct Material License No. 29–13613–02. RTI operates a facility in Rockaway, New Jersey, described as a commercial irradiator which utilizes cobalt–60, a byproduct material within the meaning of 42 U.S.C. § 2014(e).

On December 12, 1974, Commission personnel conducted an inspection of RTI's facility. As a result, a Notice of Violation was issued on January 23, 1975, alleging a failure to comply with License Condition 12 in that the licensee permitted byproduct material to be used by unauthorized persons in the facility absent the physical presence of a license-designated person. In its February 14, 1975, response to the Notice, the licensee did not contest the violation, but assured the Commission of its future compliance with License Condition 12.

On October 23, 1975, Commission personnel conducted a routine inspection of RTI's facility. A pool water sample taken by the inspector revealed an elevated level of cobalt activity in the irradiator (R & D) pool. RTI linked the activity to a "suspect pencil with a loosened endcap" which had been sealed in a pipe and stored at the bottom of the pool. A follow-up inspection was conducted on June 18, 1976. As a result, a second Notice of Violation was issued to RTI, alleging, *inter alia*, a failure to comply with the requirements of 10 C.F.R. § 20.207 in that the licensee failed to maintain constant surveillance and immediate control of licensed material stored in an unrestricted area. In its response of July 12, 1976, RTI did not contest the violation.

On October 27, 1976, at approximately 7:30 a. m., representatives of the Commission conducted an unannounced inspection of RTI's facility. One of RTI's employees accompanied the inspectors during the initial phases of the inspection. Interviews with employees, review of records and a survey of the facility revealed a series of apparent violations of Commission regulations and license conditions. On November 1, 1976, inspectors from the Commission returned to RTI's facility to make follow-up surveys and record inspections. These activities also revealed several additional apparent violations of the regulations and license conditions.

Based upon the reports resulting from the inspections of October 27 and November 1, 1976, the Director issued on January 5, 1977, a Notice of Violation, alleging nine items of noncompliance with both regulatory requirements and license conditions.[3] A Notice of Proposed Imposition of Civil Penalty was included with the Notice of Violation.

On January 31, 1977, RTI responded in writing by denying that some of the items of noncompliance had occurred and arguing that extenuating circumstances warranted the withdrawal of the civil penalties. After the Director considered RTI's response, he issued an Order Imposing Civil Penalties on March 4, 1977. RTI requested and the Commission provided a hearing on the matter before an ALJ. Eight days of hearings were held in Morristown, New Jersey, concluding on June 1, 1978.

On November 24, 1978, the ALJ issued his initial decision. He dismissed items 4 and 5 for failure of proof, found items 1 to 3 and 6 to 9 to be supported by substantial evidence and imposed penalties in the amount of $3,300. Both parties sought review by the Appeal Board. On October 16, 1979, the Appeal Board issued its decision affirming the ALJ's decision on all items of noncompliance with the exception of item 5. As to this item, the Appeal Board reversed the ALJ's dismissal of the item for failure of proof, finding that the ALJ applied an improper legal standard. Accordingly, the Appeal Board assessed civil penalties in the amount of $4,050.

On November 2, 1979, RTI filed a Petition for Review with the Commission. The Commission failed to exercise its discretion to review the decision of the Appeal Board within the time provided by the regulations as extended. Therefore, the petition was deemed to have been denied. By letter dated January 15, 1980, the Director requested payment of the $4,050 penalty. The licensee's response, dated January 24, 1980, did not enclose the payment as required. Accordingly, the instant suit was started.

In its complaint, the NRC alleges that this action is authorized under section 234

---

**3.** The particular violations are discussed in detail below. *See* pp. 1291–1301 *infra.*

of the Atomic Energy Act of 1954, as amended. 42 U.S.C. § 2282. Jurisdiction of the court is asserted under 28 U.S.C. §§ 1337 and 1391. After stating the facts of the controversy, the NRC demands judgment. against RTI for the amount of the civil penalty, together with interest and costs.

In its answer, RTI denied the material allegations of the complaint.[4] In particular, RTI denied the validity of any of the determinations of noncompliance made by NRC. As an affirmative defense, RTI sought review of the order of the NRC which imposed civil penalties, denying that it violated any regulations.[5] RTI also asserted that the inspection of its facilities "was in violation of the rules and regulations of the Commission. Such inspection was illegal and void and the fruits thereof were inadmissible as evidence in the Commission's proceedings." Answer at 2.

### III. *LEGAL ANALYSIS*

#### A. *Jurisdiction of the District Court.*

 It is the position of the plaintiff that jurisdiction in this collection action rests with the district court under 28 U.S.C. §§ 1337, 1345, and 1355. The NRC does, however, note that one exception to the district court's jurisdiction does exist, *i. e.,* review of civil penalty orders imposed as a result of, during or in furtherance of any proceeding under 42 U.S.C. § 2239 to grant, suspend, revoke or amend a license. The NRC asserts that by virtue of 28 U.S.C. § 2342(4) jurisdiction is vested in the Circuit Court of Appeals in those license/penalty actions. The NRC contends that these civil penalty orders, as collateral or ancillary orders to the license review proceeding, fall within the jurisdictional parameters of 42 U.S.C. § 2239.

In contrast to these arguments, RTI contends that "what the Government has characterized as the 'exception' is the general rule, namely, that exclusive jurisdiction for review of any final order of the NRC for a civil penalty or otherwise, lies with the circuit court of appeals." RTI's Brief at 7. Defendant's argument is premised on Congress' use of extremely broad language in 42 U.S.C. § 2239. RTI refers the court to several circuit cases which have interpreted 42 U.S.C. § 2239 in a broad manner somewhat analogous to the interpretation sought by RTI. *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n,* 606 F.2d 1261 (D.C.Cir.1979); *Virginia Electric & Power Co. v. Nuclear Regulatory Comm'n,* 571 F.2d 1289 (4th Cir. 1978); *Honicker v. Hendrie,* 465 F.Supp. 414 (M.D. Tenn.), *appeal dismissed,* 605 F.2d 556 (6th Cir. 1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980).

In particular, RTI contends that the NRC investigation, administrative hearing and penalty imposed in the instant matter "were the 'necessary first step' in a proceeding for suspending or revoking the defendant's license." RTI's Brief at 11. In fact, defendant notes that it was repeatedly threatened with the possibility of license suspension or revocation during the hearing. RTI contends that the NRC procedure of basing licensing determinations on a cumulative point system where points are assessed against licensees who are charged with civil penalties illustrates that the civil penalty and licensing proceedings are "inextricably intertwined." Furthermore, RTI argues that a determination that the district court could exercise jurisdiction in this

---

4. I must note that in its answer the defendant admits both the jurisdiction and venue of the court. However, this admission is not fatal to its later assertion that the district court lacks jurisdiction over this action. First, the court is always under an obligation to examine the basis for its exercise of jurisdiction. *Zelson v. Thomforde,* 412 F.2d 56, 58 (3d Cir. 1969); Fed.R.Civ.P. 12(h)(3). Second, in light of the liberality accorded by the courts to requests to amend the pleadings a motion to amend the

answer to contest jurisdiction would be favorably received.

5. I do not in this case address the propriety of RTI's request to have the court review the NRC's imposition of civil penalties under 42 U.S.C. § 2282(c). However, I doubt that the proper vehicle to attack the imposition of civil penalties is by affirmative defense in the collection action.

proceeding would enable the NRC to circumvent the circuit court's exclusive jurisdiction in licensing matters by simply instituting a series of civil penalty proceedings the cumulative effect of which would be an unassailable license suspension or revocation. Finally, RTI asserts that the silence of section 234 as to the circuit court's jurisdiction was a product of Congress' assumption that it was a "foregone conclusion" that jurisdiction over final orders of the NRC rested with the circuit court pursuant to 28 U.S.C. § 2342(4).

The court's analysis of this issue must begin with the plaintiff's asserted jurisdictional bases. Chapter 85 of Title 28 contains numerous statutory grants of jurisdiction to the district court which are applicable to the instant matter. 28 U.S.C. § 1337 states that "[t]he district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ." This jurisdictional grant was recognized in *Drake v. Detroit Edison Co.*, 443 F.Supp. 833 (W.D. Mich.1978), as the proper basis for the district court's exercise of jurisdiction in certain actions commenced under the Atomic Energy Act. In *Drake*, the district court indicated "[i]t is well established . . . that that statute, the Atomic Energy Act, was passed pursuant to Congress' power to regulate commerce, *see* 1964 *U.S.Code Cong. & Admin.News*, p. 3111, thus making 28 U.S.C. § 1337 the applicable jurisdictional provision." 443 F.Supp. at 836; *see* 13 C. Wright & A. Miller, *Federal Practice and Procedure* § 3574. Equally applicable is the jurisdictional grant contained in 28 U.S.C. § 1345. That section provides that "[e]xcept as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." 28 U.S.C. § 1345; 14 C. Wright & A. Miller, *supra*, § 3651. It is undisputed that the NRC is an agency of the United States suing to vindicate a specific federal statutory right. It is also clear that the NRC is "expressly authorized to sue by Act

of Congress." That authorization is set forth in section 234 of the Atomic Energy Act, as amended. 42 U.S.C. § 2282. The only difficulty that arises is defendant's contention, albeit by indirection, that 28 U.S.C. § 2342(4) is a specific jurisdictional grant to the Court of Appeals within the meaning of the first clause of 28 U.S.C. § 1345.

The Administrative Orders Review Act, in pertinent part, provides:

> The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
>
> . . . . .
>
> (4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

28 U.S.C. § 2342(4). Section 2239 of title 42 states:

> (a) In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licenses, and in any proceeding for the payment of compensation, an award or royalties under section 2183, 2187, 2236(c) or 2238 of this title, the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, . . .
>
> (b) Any final order entered in any proceeding of the kind specified in subsection (a) of this section shall be subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended, and to the provisions of section 10 of the Administrative Procedure Act, as amended.

42 U.S.C. § 2239. The present equivalent of the Act of December 29, 1950, as amended, is the Administrative Orders Review Act, 28 U.S.C. §§ 2341 to 2351. Fortunately, the Third Circuit has addressed the issue of its jurisdiction under this statute.

In *Citizens for a Safe Environment v. Atomic Energy Comm'n*, 489 F.2d 1018 (3d Cir. 1974), the petitioners sought review in the Circuit Court of an order of the AEC denying them financial assistance. The petitioners were intervenors in a proceeding before the AEC for the granting of a facility operating license for a nuclear electric energy generating station filed by several utility companies. After a review of the Administrative Orders Review Act and 42 U.S.C. § 2239, the Third Circuit, through Judge Gibbons, explained:

> Thus, if the order denying petitioners' motion for $30,000 is a final order entered in a § 2239 licensing proceeding, it is reviewable here, and not elsewhere. If it is not such an order, it is not reviewable here in the first instance, but may be reviewable, pursuant to the Administrative Procedure Act and under some other jurisdictional statute, in a district court.

485 F.2d at 1020. The test articulated by the Court to resolve this issue "has two aspects: (1) is the order one entered in a proceeding of the kind specified in § 2239(a), and (2) assuming it is of that kind, is it final." *Id.*

An application of the jurisdictional test utilized by the Third Circuit in *Citizens* to the present case clearly indicates that an action for the collection of civil penalties is properly brought before the district court, not the Court of Appeals. The first prong of the *Citizens* test simply cannot be satisfied. Proceedings under subsection (a) of 42 U.S.C. § 2239 are those that deal with the Commission's exercise of licensing and rule-making authority. *See Siegel v. Atomic Energy Comm'n*, 400 F.2d 778, 785 (D.C. Cir.1968). Contrary to the assertion of the defendant, the Commission in this matter was not exercising either of these powers. Rather, it was exercising a third and distinct authority conferred upon it under section 234. No reference is made in 42 U.S.C. § 2239 to section 234.

It is apparent that the absence of any reference to section 234 in 42 U.S.C. § 2239 was an intentional omission by Congress. Congress has established a different procedure which must be employed by the Commission when it seeks to collect a civil penalty rather than suspend or revoke a license. The legislative history of section 234 of the Atomic Energy Act, as amended, 42 U.S.C. § 2282, shows that the draftsmen intended the collection action be commenced in the district court. For a detailed discussion of the legislative history of section 234, *see* 1279–1283 *infra*. Furthermore, the absence of any reference to the jurisdiction of the Court of Appeals in section 234 collection actions militates against that court's exercise of jurisdiction and favors the exercise of jurisdiction by this court. 16 C. Wright & A. Miller, *supra*, § 3943, at 323–24.

The cases cited by RTI for a contrary interpretation of 28 U.S.C. § 2342(4) are inapposite. In *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n*, 606 F.2d 1261 (D.C.Cir.1979), the Circuit Court reviewed the district court's determination that it had jurisdiction to review determinations of the NRC and Energy Research and Development Administration (ERDA) that the NRC need not license certain storage tanks under section 202(4) of the Energy Reorganization Act of 1974, 42 U.S.C. § 5842(4), and that the ERDA need not prepare an environmental impact statement for the tanks under section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C). With respect to the district court's jurisdiction to review the NRC determination, the Circuit Court considered the question "whether the order was 'entered in a proceeding' for 'the granting ... of any license.'" 606 F.2d at 1265. In concluding that the NRC's decision was such an order, the Circuit Court reasoned:

> In the circumstances of this case, the absence of an application for a license is not dispositive. Since a licensing jurisdiction determination is a necessary first step in any proceeding for the granting of a license, we hold that NRC's decision was "entered in a proceeding" for "the granting ... of any license."

Furthermore, exclusive jurisdiction in the courts of appeals over such orders will eliminate unnecessary duplicative review and the delay and expense incidental thereto. As long as we have an administrative record on which to base our review, as we do here, there is no need for evidentiary hearings in the district court. . . .

For the foregoing reasons, we hold that exclusive jurisdiction to review NRC's determination rests in the courts of appeals. The district court erred in reviewing NRC's licensing decision on the merits.

*Id.* at 1265–66 (footnotes omitted). Clearly, the Court's characterization of the NRC's actions as "a licensing jurisdiction determination" and "licensing decision" distinguishes *Natural Resources* from the present matter, *i. e.,* a civil penalty action. Defendant's contention that the imposition of a civil penalty is a predicate to a license suspension or revocation does not convert the agency's former action into the later. Defendant itself has the ability to remove this predicate by compliance with the agency's regulations and its license conditions. The fact that it decides not to conform should not be and is not a factor which affects the jurisdiction of this court.

Likewise, the case of *Virginia Electric & Power Co. v. Nuclear Regulatory Comm'n,* 571 F.2d 1289 (4th Cir. 1978), does not support defendant's position. In that case Virginia Electric & Power Co. (VEPCO) petitioned the Court of Appeals for review of an order of the NRC imposing civil penalties against VEPCO "for making false statements in connection with its application for a license to construct and operate a nuclear power plant." *Id.* at 1290 (footnote omitted). VEPCO contended, *inter alia,* that the Commission had misconstrued section 186 of the Atomic Energy Act, 42 U.S.C. § 2236. Although the Fourth Circuit did not engage in an independent determination of its jurisdiction to consider the petition, the Court considered itself vested with such jurisdiction since it reviewed and affirmed the agency's action. However, the Fourth Circuit was reviewing a civil penalty order which emanated from a licensing proceeding. Although such an order presumably was issued pursuant to the Commission's authority under section 234(a), it is literally a "final order entered in any proceeding of the kind specified in subsection (a) of [section 2239]" and thus within the exclusive jurisdiction of the court of appeals. 42 U.S.C. § 2239(b). Again, I must emphasize that in the instant matter the civil penalty order was issued in a section 234(b) proceeding, not a licensing proceeding.

Finally, defendant's reliance on *Honicker v. Hendrie,* 465 F.Supp. 414 (M.D.Tenn.), *appeal dismissed,* 605 F.2d 556 (6th Cir. 1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980), is of no avail. That case concerned a district court's dismissal of an action by an individual against members of the NRC in which the plaintiff sought an injunction ordering the NRC to revoke the licenses of all nuclear fuel cycle facilities. The court held that the court of appeals had exclusive jurisdiction to enjoin orders of the NRC issued out of licensing or rule-making proceedings. Again, the distinction is evident. *Honicker* involved a licensing proceeding, whereas this case concerns a penalty action.

My holding that jurisdiction to entertain this section 234(c) collection action is vested in the district court is buttressed by the jurisdictional grant set forth in 28 U.S.C. § 1355. Section 1355 provides:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress.

28 U.S.C. § 1355; *Lees v. United States,* 150 U.S. 476, 478–479, 14 S.Ct. 163, 163–164, 37 L.Ed. 1150 (1893); *United States v. General Motors Corp.,* 403 F.Supp. 1151, 1152 (D.Conn.1975). It is clear that the court has jurisdiction under this statutory grant, unless, as noted in *Lees v. United States, supra,* "it [jurisdiction] is in express terms placed exclusively elsewhere." 150 U.S. at 479, 14 S.Ct. at 164. Although 42 U.S.C.

§ 2239(b) when read in conjunction with 28 U.S.C. § 2342(4) does vest the Court of Appeals with exclusive jurisdiction over numerous NRC determinations, review of section 234 penalty decisions is not one such determination. Accordingly, for the reasons set forth above, I hold that the district court, not the Court of Appeals, has jurisdiction over a section 234(c) collection action.

## B. *Judicial Review.*

■ Since I have held that the district court has jurisdiction over this action, I must now address the court's function in the collection process. Although the parties do not contest the propriety of judicial review, they are diametrically opposed with respect to the scope of review to be employed by the court. Initially, it was the NRC's position that the court need not consider this issue. However, if the court were to address the point, the NRC asserts that "[i]n such cases, collection must be preceded [*sic*] by a trial *de novo*, . . .; a fact recognized by the Commission in seeking civil penalty authority." NRC's Brief at 15 n.6. However, in a letter to both parties, I requested that the issue of this court's scope of review be briefed. In response to the court's inquiry, the NRC tempered its earlier position and now asserts that "[w]here, as here, the order is based on an adjudicatory hearing guaranteed by the applicable regulations, the proper scope of review is the 'substantial evidence' test" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(E). NRC's Supplemental Brief at 6 (footnote omitted).

In contrast to this assertion, RTI argues that the NRC's initial position was correct, *i. e.*, the court must engage in a trial *de novo*. RTI argues that as a matter of case law, citing *United States v. J. B. Williams Co.*, 498 F.2d 414 (2d Cir. 1974), and construction of analogous statutory authority vested in the Federal Trade Commission, 15 U.S.C. § 45(*l*), the Federal Communications Commission, 47 U.S.C. §§ 503, 504, and the Federal Aviation Agency, 49 U.S.C. § 1471, review by the district court is by trial *de novo.* RTI's Brief at 17–23.

Essentially, the government urges the court to engage in a limited review of an agency's determination, while the defendant asserts that it is entitled to a trial *de novo* similar to that provided in most other collection actions. For purposes of clarity, I will first pursue the avenue suggested by the government and then engage in a discussion of the defendant's contention.

### 1. *Propriety of Judicial Review.*

Judicial review of agency actions is governed by the standards set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701 to 706 (hereinafter referred to as the "APA"). Two sections of the APA are particularly important and merit some detailed discussion. In pertinent part, section 701 states:

> (a) This chapter [Judicial Review] applies, according to the provisions thereof, except to the extent that—
>
> (1) statutes preclude judicial review; or
>
> (2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a). The various standards of review to be employed by the court are set forth in 5 U.S.C. § 706. The relevant provisions in this section indicate:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> . . . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706(2). Thus, at this juncture, the issues to be addressed are: first, whether any judicial review is appropriate; and, second, assuming some type of judicial review is proper, what standard of review should be employed. The Supreme Court's decision in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), establishes the court's method of inquiry.

The first issue—existence of judicial review—is, of course, governed by the two-pronged test set forth in section 701 of the APA. With respect to the first prong, 5 U.S.C. § 701(a)(1), the *Volpe* Court explained that there must be a showing by clear and convincing evidence of legislative intent that "Congress sought to prohibit judicial review." 401 U.S. at 410, 91 S.Ct. at 820, *A. O. Smith Corp. v. Federal Trade Comm'n,* 530 F.2d 515, 520 (3d Cir. 1976); *Local 2855, AFGE v. United States,* 602 F.2d 574 (3d Cir. 1979). In other words, "[t]he reviewing court must determine whether 'Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion.'" *Morris v. Gressette,* 432 U.S. 491, 501, 97 S.Ct. 2411, 2418, 53 L.Ed.2d 506 (1977) (quoting *Barlow v. Collins,* 397 U.S. 159, 165, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970)).

Since no provision in the Atomic Energy Act expressly precludes judicial review of the Commission's decision under section 234, "it is necessary to determine 'whether non-reviewability can fairly be inferred.'" *Morris v. Gressette,* 432 U.S. at 501, 97 S.Ct.

2418 (quoting *Barlow v. Collins,* 397 U.S. at 166, 90 S.Ct. at 837). This inquiry must address the role played by the commission within "the context of the entire legislative scheme." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

Resort to the legislative history of section 234 dispels any notion that Congress inferred nonreviewability. When the Joint Committee on Atomic Energy held its hearings on the proposed AEC Omnibus Legislation in 1969 it had before it several bills, one of which was proposed by the AEC. H.R. 9648, S. 1882, 91st Cong., 1st Sess. (1969). During his testimony on the bill, AEC's General Counsel explained that under the provisions in the AEC's proposal regarding collection of civil penalties "an alleged violator is guaranteed an opportunity for a full hearing on the merits in Federal district court before any civil penalty may be collected from him." *Hearings Before the Joint Comm. on Atomic Energy on AEC Omnibus Legislation—1969,* 91st Cong., 1st Sess. 29–30 (1969) (hereinafter cited as *"Hearings on AEC Omnibus Legislation—1969"*) (statement of Joseph F. Hennessey). The AEC also provided written answers to certain inquiries made by the Joint Committee. In one answer, the AEC explained that "[u]nder this legislation an alleged violator's guarantee of hearing is provided in Federal district courts." *Id.* at 37–38. Thus, in light of comments before the Joint Committee and with due consideration given to the Supreme Court's mandate that the APA's "'generous review provisions' must be given a 'hospitable' interpretation," *Abbott Laboratories,* 387 U.S. at 141, 87 S.Ct. at 1511, I conclude that Congress did not infer, by its silence on judicial review of section 234 collection actions, that such agency action was nonreviewable. 5 U.S.C. § 701(a)(1).

Nor does a review of the statutory scheme reveal that "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This case is not one of "those rare instances where 'statutes are drawn in such broad terms that in a given

case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).

> [A]gency action may be determined to be "committed to agency discretion by law" only when a fair appraisal of the entire legislative scheme, including a weighing of the practical and policy implications of reviewability, persuasively indicates that judicial review should be circumscribed. . . .
>
> A predicate to nonreviewability is that the agency have *broad* discretionary powers, not merely that its action involve *some* discretion."

*Local 2833, AFGE v. United States*, 602 F.2d at 578 (footnote omitted) (emphasis in original).[6] Although the AEC is vested with substantial discretion to impose civil penalties, it is clear that its discretion is not so broad as to foreclose review. The legislative history referred to above indicates that the AEC itself was not seeking nonreviewable authority. Furthermore, the procedural scheme established in section 234(b) as well as the judicial review provision of 42 U.S.C. § 2239(b), indicate that some review was intended and that there is "law to apply." Accordingly, I hold that civil penalties imposed by the Commission pursuant to its section 234 authority are subject to judicial review. I reject the dictum contained in *Drake v. Detroit Edison Co.*, 453 F.Supp. 1123 (W.D.Mich.1978), espousing a contrary position. In *Drake*, the court in its concluding remarks indicated that

> [i]t is clear that the decision to impose penalties or institute proceedings is committed to agency discretion by law. Indeed, such decisions, whether made by administrative agencies or prosecuting attorneys, have historically been deemed to lie at the heart of the executive discretionary decision-making process and beyond the scope of judicial review.

*Id.* at 1131. I note that the issue addressed by the *Drake* court was not the scope of review to be employed by a court reviewing a civil penalty imposed under section 234. I also highlight the fact that the *Drake* court did not engage in the analysis required by the Supreme Court in *Volpe*. Thus, having decided that judicial review is required, I now address the issue of the scope of that review. As will be seen shortly, the determination of the scope of review involves the discussion of material also relevant to the resolution of this case in a manner consistent with defendant's contentions.

*2. Scope of Review.*

■ Again, reference must be made to the Supreme Court's decision in *Citizens to Preserve Overton Park v. Volpe, supra.* In *Volpe*, the Court explained:

> In all cases agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2)(A), (B), (C), (D). . . . In certain narrow, specifically limited situations, the agency action is to be set aside if the action was not supported by "substantial evidence." And in other equally narrow circumstances the reviewing court is to engage in a de novo review of the action and set it side if it was "unwarranted by the facts." 5 U.S.C. § 706(2)(E), (F) . . .
>
> . . . . .
>
> Review under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself, 5 U.S.C. § 553 . . ., or

---

**6.** The Third Circuit in *Local 2855* indicates that even if a determination is made that the matter is unreviewable, the court

> may entertain charges that the agency lacked jurisdiction, that the agency's decision was occasioned by impermissible influences, such as fraud or bribery, or that the decision violates a constitutional, statutory or regulatory

command. For the APA circumscribes judicial review only "*to the extent that* . . . agency action is committed to agency discretion by law;" it does not foreclose judicial inquiry altogether.

602 F.2d at 580 (footnote omitted) (emphasis in original).

when the agency action is based on a public adjudicatory hearing. See 5 U.S.C. §§ 556, 557. . . .

. . . de novo review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate. And, there may be independent judicial factfinding when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. H.Rep.No.1980, 79th Cong., 2d Sess., *reprinted in* Senate Judiciary Committee, Legislative History of the Administrative Procedure Act 279.

401 U.S. at 413–415, 91 S.Ct. at 822–823. Thus, it is clear that the Commission's imposition of civil penalties must pass muster under the standards set forth in paragraphs (A) through (D) of section 706(2). However, what must be determined is the applicability of either paragraph (E), the substantial evidence standard, or paragraph (F), the trial *de novo* standard.

In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court again commented on the nature of the review process under the APA. In *Camp*, the Court explained:

It is quite plain from our decision in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), that de novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions.

411 U.S. at 141–142, 93 S.Ct. at 1243–1244. It is clear that this proceeding is one brought to enforce a determination of the NRC. Therefore, application of the standards set forth in the APA, as interpreted by the courts, leads me to a determination that a trial *de novo* would be in order. Furthermore, the Second Circuit's comments in *United States v. J. B. Williams Co.*, 498 F.2d 414 (2d Cir. 1974), interpreting section 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), a statute upon which section 234 was modeled, see *infra*, are instructive. In that case, the Court indicated:

There can be no doubt that in general "there is a right of jury trial when the United States sues . . . to collect a penalty, even though the statute is silent on the right of jury trial," 5 Moore, Federal Practice ¶ 38.–31[1], at 232–33 (1971 ed.). The leading case supporting this proposition is *Hepner v. United States, supra,* 213 U.S. [103] at 115, [29 S.Ct. 474, 53 L.Ed.2d 720] where the Court had no difficulty in concluding that in an action to collect a $1,000 penalty assessed for a violation of the Alien Immigration Act, "[t]he defendant was, of course, entitled to have a jury summoned." . . .

Many cases, arising under a broad range of other civil penalty and forfeiture provisions, have reached the same conclusion. In *The Sarah*, 8 Wheat. 391, 21 U.S. 391, 5 L.Ed. 644 (1823), the Court held that when goods were seized on land, a statutory libel of information entitled the defendant to a jury trial. The Court has consistently held since then that forfeitures occurring on land are civil actions at law, entitling the parties to a jury unless it was waived. *United States v. Winchester*, 99 U.S. 372, 374, 25 L.Ed. 479 (1878); *433 Cans of Frozen Egg Product v. United States*, 226 U.S. 172, 183, [33 S.Ct. 50, 52] 57 L.Ed. 174 (1912); *C. J. Hendry Co. v. Moore*, 318 U.S. 133, 153, 63 S.Ct. 499, 87 L.Ed. 663 (1943). Similarly, actions for statutory penalties have been held to entail a right to jury trial, even though the statute is silent, both where the amount of the penalty was fixed and where it was subject to the discretion of the court, see, *e. g., Atchison, Topeka & Santa Fe Ry. v. United States*, 178 F. 12 (8 Cir. 1910) (28-hour law); *Connolly v. United States*, 149 F.2d 666 (9th Cir. 1945) (penalty under 25 U.S.C. § 179); *United States v. Jepson*, 90 F.Supp. 983, 984–986 (D.N.J.1950) (Emergency Price Control Act of 1942); *United States v. Friedland*, 94 F.Supp. 721 (D.Conn.1950) (Housing and Rent Act of 1947); *United States ex rel. Rodriguez v. Weekly Publications*, 9 F.R.D. 179 (S.D.N.Y.1949) *qui tam* action to recover statuto-

ry penalty for making false claim against the Government).

498 F.2d at 422–23 (footnote omitted) (citation omitted).

This determination, however, does not need to rest on an application of such general principles. Resort to the statute itself is instructive. Yet, unlike many civil penalty statutes, section 234 of the Atomic Energy Act is silent on the applicable scope of review. Therefore, an examination must be made of both its legislative history and analogous common law authority.

On January 17, 1969, the AEC transmitted to the Congress proposed legislation (hereinafter referred to as the "AEC Bill") seeking authorization to, *inter alia*, levy civil penalties against violators of the Commission's regulations, orders and license conditions. On March 27, 1969, the proposed bill was introduced by Chet Holifield, Chairman of the Joint Committee on Atomic Energy, by request, as H.R. 9648, 91st Cong., 1st Sess. (1969), and on April 18, 1969, by Vice Chairman John Pastore, by request, as S. 1882, 91st Cong., 1st Sess. (1969). Also, on April 18, 1969, Senator Pastore introduced S. 1878, 91st Cong., 1st Sess. (1969) (hereinafter referred to as the "Pastore Bill"), a bill identical to S. 3958, 90th Cong., 2d Sess. (1968), which he had introduced in the 90th Congress, but on which no final action was taken by the Joint Committee. The Pastore Bill also proposed adding a new section to the Atomic Energy Act conferring on the AEC authority to impose civil monetary penalties. I note, however, that the AEC Bill differed in some significant aspects from the Pastore Bill. *See* 1281 *infra*.

Beginning on September 12, 1969, the full committee held hearings on the various measures before it. The principal executive branch witness was Joseph F. Hennessey, General Counsel for the AEC. Mr. Hennessey provided the Joint Committee with the views of the AEC on the various bills then pending. During the course of his testimony on the AEC Bill, Mr. Hennessey testified:

> In order to assure that we can act flexibly and effectively against any safety violation, we consider it necessary to have a full range of remedial powers. There may be cases in which license suspension or revocation is not in the public interest, but in which the importance of full adherence to regulatory requirements should be emphasized by more than a notice of violation or a cease and desist order.
>
> In such cases, a civil monetary penalty could be imposed without requiring the cessation of an activity which might be of material benefit to the public or without depriving the licensee or his employees of their means of livelihood.
>
> All of the major regulatory agencies in the Federal Government have statutory authority to impose civil penalties in appropriate cases to assist them in carrying out their regulatory functions, although the statutory provisions for each differ somewhat.
>
> The proposed legislation is modeled upon similar provisions in the Federal Communications Act (47 U.S.C. 503–504) and the Federal Aviation Act (49 U.S.C. 1471).

*Hearing on AEC Omnibus Legislation— 1969, supra*, at 28–29 (statement of Joseph F. Hennessey). Mr. Hennessey then engaged in a section-by-section analysis of the AEC Bill.[7] He explained:

---

7. The relevant provisions of the AEC Bill read: Sec. 234. Civil Monetary Penalties for Violations of Licensing Requirements.—

. . . . .

b. Whenever the Commission has reason to believe that a person has become subject to the imposition of a civil penalty under the provisions of this section, it shall notify such person of its intention to impose a civil penalty and of the proposed amount thereof, and give him a reasonable opportunity to show in

writing either that he has not committed the violation charged, or that such violation took place under mitigating circumstances. The notice shall also advise such person that upon failure to pay the civil penalty subsequently determined by the Commission, if any, the penalty may be collected by a civil action.

c. On the request of the Commission, the Attorney General is authorized to institute a civil action to collect a penalty imposed pur-

Section b. also provides that the notice would advise the alleged violator that upon failure to pay the civil penalty subsequently determined by the Commission, if any, the penalty may be collected by a civil action. Such civil action would be instituted by the Department of Justice in Federal district court where the right to a full hearing on the merits of the charges would exist.

Section c. deals with the responsibility of the Attorney General. If after the Commission determines that a penalty should be imposed, the licensee fails to pay, the matter is referred to the Attorney General. He will determine whether a civil action for collection in Federal district court should be instituted. He is given exclusive authority to compromise, mitigate, or remit the civil penalty after the matter has been referred by the AEC.

Under these provisions, an alleged violator is guaranteed an opportunity for a full hearing on the merits in Federal district court before any civil penalty may be collected from him.

The proposed amendments, in accordance with the basic authority provided in section 161 of the Atomic Energy Act and the Administrative Procedure Act, would also permit the Commission to provide a full administrative hearing to any person charged with violations or to handle the matter informally.

Let me assure you that the Commission will always provide a person with a full administrative hearing, if requested, prior to determining that a civil penalty should be imposed and before referring the matter to the Department of Justice.

*Id.* at 29–30. Finally, in response to an inquiry from Representative Price with respect to the other regulatory agencies vested with civil penalty authority, Mr. Hennessey indicated:

MR. HENNESSEY. . . . all of the six major regulatory agencies have civil penalty authority now.

(Subsequently, the AEC furnished the following information:)

*Examples of the authority of the principal regulatory agencies to impose civil penalties*

Federal Power Commission, 16 U.S.C. 825(n).

Securities Exchange Commission, 15 U.S.C. 78ff(b).

Interstate Commerce Commission, 49 U.S.C. 20(7)(a).

Federal Trade Commission, 15 U.S.C. 45(*l*).

Federal Communications Commission, 47 U.S.C. 503, 504.

Federal Aviation Agency, 49 U.S.C. 1471.

*Id.* at 34.

Incorporated into the hearings record were numerous prepared answers by the AEC in response to formal submissions to the agency by the executive director of the Joint Committee.

*Q.2. Neither of the civil penalty proposals appears to require an AEC hearing, or an opportunity for hearing, before such a penalty can be imposed; is that correct? Do you believe this comports with due process requirements?*

A. We believe that the civil penalty legislation proposed in both H.R. 9648 and S. 1878 comports with due process with respect to the absence of hearing requirements. As previously stated, our proposed legislation was based upon the civil penalty provisions in the Federal Aviation Act and the Federal Communications Act. Other regulatory agencies have similar statutes. Under this legislation an alleged violator's guarantee of hearing is provided in Federal district courts. As we stated in our testimony, however, the Commission would follow the procedures set forth in our "Rules of Practice" to provide any person charged with violations an opportunity to show that he did not commit the violations or that they

suant to this section. The Attorney General shall have the exclusive power to compromise, mitigate, or remit such civil penalties as are referred to him for collection.

H.R. 9648, S. 1882, 91st Cong., 1st Sess. § 1 (1969) *reprinted in Hearings on AEC Omnibus Legislation—1969, supra,* at 3.

were committed under mitigating circumstances. We would also offer him the opportunity to request a full administrative hearing before the Commission prior to a determination that a civil penalty should be imposed.

*Q.3. Instead of court litigation as provided for under these bills, why wouldn't it be preferable to have AEC conduct the entire proceedings within the Commission on an administrative basis subject to the requirements of the Atomic Energy and Administrative Procedure Acts? Wouldn't this be fairer to and less expensive for the alleged offender, who could still appeal an adverse decision to the courts?*

A. We do not believe that conducting the entire matter before the AEC would necessarily be fairer or less expensive. We initially considered the approach of having the entire civil penalties proceedings take place before the AEC, including a full administrative hearing before the Commission and the right of the alleged offender to contest the Commission's actions by appeal to a United States Court of Appeal[s]. As we understand it, no agency has been given this type of authority because this would tend to cut off a judicial trial *de novo* of a "penalty" action. A case involving formal regulatory action imposes approximately the same financial burden upon the alleged offender, quite aside from the penalty itself, if levied. While the offender may appear *pro se* in a formal hearing before the Commission and in Federal court, our experience has been that persons faced with such hearings before the Commission normally have been represented by counsel. Other expenses involve the loss of time, travel, and other expenses incident to litigation.

Finally it is not our purpose to seek novel statutory authority, which would tend to create court tests as to its validity. We seek only the same authority as that provided to other Federal regulatory agencies.

*Id.* at 38 (letter from Joseph F. Hennessey) (footnotes omitted).

Later on September 12, 1969, the Joint Committee met in executive session to consider the various aspects of the proposed legislation. On November 18, 1969, the Joint Committee convened again in executive session and voted to incorporate the pending bills, with certain amendments, into "clean bills." These clean bills were introduced on November 20, 1969, by Chairman Holifield for himself, Representative Price and Representative Hosmer as H.R. 14925, 91st Cong., 1st Sess. (1969). On November 21, 1969, Vice Chairman Pastore introduced the clean bills as S. 3169, 91st Cong., 1st Sess. (1969). On November 24, 1969, the Joint Committee voted to approve the reporting of the clean bills favorably and without amendment. The Committee Reports [8] accompanying both bills are somewhat revealing. The Joint Committee made numerous comments on proposed section 234 [9] of the Atomic Energy Act. As the "rationale" for this section, the Joint Committee indicated that:

> Section 4 of the bill reported herewith would amend the Atomic Energy Act by adding new section 234 authorizing the Atomic Energy Commission to levy civil monetary penalties on persons who violate the licensing provisions of the act or any rule, regulation, order, or license issued thereunder. Substantially the same remedial authority has been conferred by statute upon other regulatory agencies, such as the Federal Communications Commission, the Federal Aviation Agency, and the Federal Trade Commission, to assist them in carrying out their regulatory functions.

. . . . .

---

**8.** Since both the Senate and House Reports on the bills are nearly identical my references to Senate Report is due to the fact that it is more generally available since it is reprinted in the *U.S. Code Congressional & Administrative News* 1969, p. 1607.

**9.** The proposed section 234 as set forth in the clean bills, H.R. 14925, 91st Cong., 1st Sess. § 4 (1969), and S. 3169, 91st Cong., 1st Sess. § 4 (1969), was enacted verbatim. For the text of this section, *see* 1268–1269 *supra.*

During its consideration of this legislation the committee had before it two somewhat different legislative proposals on civil monetary penalties—that submitted by the AEC (H.R. 9648, S. 1882) and that introduced by Senator Pastore (S. 1878). The committee has drawn from what it considered to be the best features of both of these proposals in formulating the proposed new section 234 entitled "Civil Monetary Penalties for Violations of Licensing Requirements" reflected in section 4 of the bill reported favorably by the committee.

... Procedural safeguards, including requirements that written notice be given by the AEC to the alleged violator of each act or omission with which he is charged and that an opportunity be provided for such person to show in writing why the proposed penalty should not be imposed, are specifically spelled out in the proposed legislation. In addition, basic authority provided in section 161 of the Atomic Energy Act and in the Administrative Procedure Act would permit the Commission to provide a full administrative hearing to any person charged with violation if such person so requested. The Commission assured the committee during the public testimony that it would always provide such a full administrative hearing, if requested, prior to determining that a civil penalty should be imposed.

Should the Commission, following the completion of such procedures, determine that a penalty should be imposed, and should the violator fail to pay the amount assessed, the matter would be referred to the Attorney General. The Attorney General would be authorized, but not required, to institute a civil action in a court of competent jurisdiction to collect the penalty. While the bill would confer on the Commission the power of compromise, mitigation, and remission of penalties, such power would reside exclusively with the Attorney General under the bill with respect to such civil penalties as are referred by the AEC to him for collection.

S.Rep.No.91–553, 91st Cong., 1st Sess. 9, 11, *reprinted in* [1969] *U.S.Code Cong. & Ad. News* 1607, 1615–16, 1617–18; H.R.Rep.No. 91–691, 91st Cong., 1st Sess. 9, 11 (1969). During its section-by-section analysis the Joint Committee explained:

The effect of adding section 234 to the act is to authorize the Commission to impose monetary civil penalties in addition to or in lieu of taking administrative action presently authorized. It is intended that the penalties prescribed under section 234 shall be available in addition to any other specific or general sanctions provided by law.

. . . . .

The new section 234 further provides that whenever the Commission has reason to believe that a person has become subject to imposition of a civil penalty, it shall notify the person in writing of the details of each asserted violation, the provisions deemed to have been violated, its intention to impose a civil penalty, and the proposed amount thereof. Such written notice shall be sent by the Commission by registered or certified mail to the last known address of such person. Reasonable opportunity shall then be afforded the person notified to show in writing why the proposed penalty should not be imposed. On request of the Commission, the Attorney General is authorized to institute civil action to collect any penalty imposed pursuant to section 234. The 5-year statute of limitations provided under Title 28, United States Code, section 2462 would be applicable to violations covered by section 234. Both the AEC and the Attorney General would be empowered by the bill to compromise, mitigate, or remit such penalties, but this power shall be exclusively that of the Attorney General with respect to such civil penalties as are referred to him for collection.

S.Rep.No.91–553, *supra*, at 15–16, [1969] *U.S.Code Cong. & Ad.News* at 1621–22; H.R.Rep.No.91–691, *supra*, at 15–16.

In December of 1969, the clean bills went before the Senate and House for considera-

tion and passage on December 1, 1969, and December 15, 1969, respectively. The Senate bill was passed in lieu of the House bill.

This examination of the legislative history of section 234 aids the court in numerous ways in its determination of the proper scope of judicial review. Initially, I note that both the Senate and House Reports on the clean bills are silent on the scope of judicial review to be employed by a district court in a collection action. This silence by the Joint Committee is in direct contrast to the commentary of the AEC as to its interpretation of the scope of review to be employed by a court under its proposed bill. The Joint Committee had before it two different bills on civil penalties. The Committee specifically indicated that it drew elements from both the AEC Bill and the Pastore Bill in formulating its clean bills. The Joint Committee was, of course, not bound by the proposals before it nor was it bound by the interpretation of those proposals by the agency submitting them. In fact, the inference is unavoidable that the Joint Committee was not in total accord with the recommendations of the AEC as to the manner by which the civil penalty authority should be implemented. Accordingly, it is uncertain whether the AEC's interpretation of its bill as requiring a trial *de novo* in collection actions can be considered indicative of the intention of Congress in passing the Joint Committee's clean bills. Therefore, although the AEC's statements on its bill are instructive, they are not binding on the court in this matter. Second, and more importantly, it is evident that the common theme throughout the entire legislative process was to provide the AEC with civil penalty authority similar to that authority previously granted to other regulatory agencies. In particular both the Senate and House Reports make reference to the authority vested in the Federal Communications Commission, the Federal Aviation Agency and the Federal Trade Commission. Thus, consideration of the scope of review employed by the courts in collection actions initiated by these other agencies is necessary before the proper scope of review to be employed in the instant matter may be determined.

(a) *Federal Communications Commission.*

Section 504(a) of the Communications Act, 47 U.S.C. § 504(a), as amended by the Communications Act Amendments of 1960, Pub.L. 86–752, § 7(b), 74 Stat. 894–95, provided that forfeitures imposed by the Federal Communications Commission (hereinafter referred to as "FCC")

shall be payable into the Treasury of the United States, and shall be recoverable in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office or in any district through which the line or system of the carrier runs: *Provided,* That any suit for the recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo: ... It shall be the duty of the various United States attorneys, under the direction of the Attorney General of the United States, to prosecute for the recovery of forfeitures under this chapter.

47 U.S.C. § 504(a) (amended in 1978).

This section has been interpreted as requiring a trial *de novo* with a jury. *Illinois Citizens Comm. for Broadcasting v. Federal Communications Comm'n,* 515 F.2d 397, 405–06 n. 19 (D.C.Cir.1975); *see Pleasant Broadcasting Co. v. Federal Communications Comm'n,* 564 F.2d 496 (D.C.Cir.1977). In actions under this penalty statute it is recognized that the district court "is not limited to a review of the administrative record before the FCC, nor do the findings and conclusions of the Commission *in this case* carry any weight whatsoever.... The words 'de novo' mean that 'the court should make an independent determination of the issues.'" *Federal Communications Comm'n v. Summa Corp.,* 447 F.Supp. 923, 925 (D.Nev.1978) (quoting *United States v. First City National Bank of Houston,* 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151 (1967)) (emphasis in original) (citation omitted). "The broad powers of judicial review granted in the ... statute ... necessarily include the power to review both

the facts surrounding the alleged violation and the amount of any forfeiture imposed." *United States v. Daniels*, 418 F.Supp. 1074, 1080–81 (D.S.D.1976). The courts have granted summary judgment when appropriate. *E.g., United States v. Daniels, supra*, 418 F.Supp. at 1081.

### (b) *Federal Aviation Agency.*

A striking similarity exists between the language authorizing the Secretary of Transportation to assess civil penalties under the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1301 *et seq.*, and the language presently under consideration. Under the Federal Aviation Act, as in effect when the Joint Committee was considering section 234,[10] any person who violated specifically enumerated provisions of the Federal Aviation Act, or any term, condition, or limitation of any permit or certificate, or any rule or regulation promulgated under the Act was subject to a civil penalty of not to exceed $1,000 for each violation. The civil penalty provision contained certain procedural safeguards:

> The amount of any such penalty which relates to the transportation of hazardous material shall be assessed by the Secretary, or his delegate, upon written notice upon a finding of violation by the Secretary, after notice and opportunity for a hearing. In determining the amount of such penalty, the Secretary shall take into account the nature, circumstances, extent, and gravity of the violation committed and, with respect to the person found to have committed such violation, the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and

such other matters as justice may require. . . .

49 U.S.C. § 1471(a)(1) (1976) (amended 1978).

However, unlike section 234 of the Atomic Energy Act, Congress set forth the manner by which the civil penalties imposed for violations of the Federal Aviation Act were to be collected. That Act stated:

> Any civil penalty imposed under this chapter may be collected by proceedings in personam against the person subject to the penalty and, in case the penalty is a lien, by proceedings in rem against the aircraft, or by either method alone. Such proceedings shall conform as nearly as may be to civil suits in admiralty, except that either party may demand trial by jury of any issue of fact, if the value in controversy exceeds $20, and the facts so tried shall not be reexamined other than in accordance with the rules of the common law.

49 U.S.C. § 1473(b)(1) (1976) (amended 1978). Courts which have interpreted these provisions agree that a libel action is the proper vehicle by which to adjudicate the propriety of the civil penalty assessment. *B & M Leasing Corp. v. United States*, 331 F.2d 592 (5th Cir. 1964); *United States v. Duncan*, 280 F.Supp. 975 (N.D.Tex.1968). The standard of proof was set as the preponderance of the evidence test. *United States v. Ozark Air Lines, Inc.*, 419 F.Supp. 795, 799 (E.D.Mo.1976); *Aircrane, Inc. v. Butterfield*, 369 F.Supp. 598, 611 (E.D.Pa. 1974) (holding that "in the court proceeding the government must prove the violation by a preponderance of the evidence and the alleged violators have the opportunity to

---

**10.** I am compelled to comment, however, on the amendments to this section in 1978. In that year, Congress amended 49 U.S.C. § 1471 to add, *inter alia*, the following provision:

> The amount of any such civil penalty for any violation of any provision of subchapter IV of this chapter, or any rule, regulation, or order issued thereunder, or under section 1482(i) of this title, or any term, condition, or limitation of any permit or certificate assessed under subchapter IV of this chapter shall be issued by the [Civil Aeronautics] Board only after notice and an opportunity for a hearing and

> after written notice upon a finding of violation by the Board. Judicial review of any order of the Board assessing such a penalty may be obtained only pursuant to section 1486 of this title.

49 U.S.C. § 1471 (Supp.1978) (amending 49 U.S.C. § 1471 (1976)). Section 1486 directs review of "any order" issued by the Board to the Courts of Appeals. "The findings of facts by the Board . . ., if supported by substantial evidence, shall be conclusive." 49 U.S.C. § 1486(e).

interpose defenses"); *United States v. Garrett*, 296 F.Supp. 1302, 1304 (N.D.Ga.), aff'd, 418 F.2d 1250 (5th Cir. 1969), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2239, 26 L.Ed.2d 792 (1970). Summary judgment was also appropriate in numerous situations. *Rawdon v. United States*, 364 F.2d 803, 804 (9th Cir. 1966), *cert. denied*, 386 U.S. 909, 87 S.Ct. 858, 17 L.Ed.2d 783 (1967); *United States v. Hayes*, 264 F.2d 929, 930 (2d Cir. 1959).

### (c) *Federal Trade Commission.*

The authority of the Federal Trade Commission (hereinafter referred to as "FTC") to impose civil penalties is set forth in section 5(*l*) of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45(*l*). That section states:

> Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of such order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense.

15 U.S.C. § 45(*l*) (amended 1980). The enforcement of civil penalties imposed by the FTC was delegated to the Attorney General by statute.

> Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty ... under subsection (*l*) of section 45 of this title, it shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisio[n] of such ... subsection.

15 U.S.C. § 56 (amended in 1975). These provisions have been interpreted as requiring a jury trial in a section 5(*l*) civil penalty collection action. *United States v. J. B.*

*Williams Co.*, 498 F.2d 414 (3d Cir. 1974); *United States v. Hindman*, 179 F.Supp. 926 (D.N.J.1960). *But see United States v. Vulcanized Rubber & Plastics Co.*, 288 F.2d 257, 258–59 n. 2 (3d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961). Although a jury trial right has not been universally accepted, certainly a right to an evidentiary hearing has been imbued into the Act. *United States v. Ancorp Nat'l Servs., Inc.*, 516 F.2d 198 (2nd Cir. 1975); *United States v. Reader's Digest Ass'n, Inc.*, 494 F.Supp. 770 (D.Del.1980); *United States v. American Greetings Corp.*, 168 F.Supp. 45 (N.D.Ohio 1958); *see Federal Trade Comm'n v. Consolidated Foods Corp.*, 396 F.Supp. 1353 (S.D.N.Y.1975). This proceeding, however, is limited in scope to two clearly defined issues. They are whether the defendant violated the FTC order in question, and if so, what amount of money should be assessed as a penalty. *United States v. Reader's Digest Ass'n, Inc.*, 464 F.Supp. 1037, 1043 (D.Del.1979). Of course, summary judgment has been employed in section 5(1) collection actions when viewed by the courts as within the perimeters of the federal rules. *Piuma v. United States*, 126 F.2d 601 (9th Cir. 1942); *United States v. Papercraft Corp.*, 393 F.Supp. 408 (W.D. Pa.1975); *United States v. Hindman, supra*, 179 F.Supp. at 928.

This review of the statutory authority vested in the regulatory agencies upon which the NRC's authority was modeled indicates that the substantial evidence standard of review would be inappropriate in the present section 234 collection action. Congress has indicated that the NRC's authority is "[s]ubstantially the same remedial authority [that] has been conferred by statute upon ... the Federal Communications Commission, the Federal Aviation Agency, and the Federal Trade Commission, to assist them in carrying out their regulatory functions." S.Rep.No.91–553, *supra*, at 2, *U.S. Code Cong. & Ad.News, supra*, at 1616; H.R.Rep.No.91–691, *supra*, at 9. The judiciary's function in collection actions brought by these agencies is not limited to a review of the administrative record as supported

by substantial evidence. Rather, trial *de novo* is the usually employed course of action. I am convinced that a trial *de novo* is the course of action contemplated by the Congress in collection actions pursuant to section 234(c).[11] Furthermore, a trial *de novo* is quite appropriate in this action inasmuch as the NRC was acting as "both prosecutor and judge" in the penalty proceedings. *Federal Communications Comm'n v. Summa Corp., supra,* 447 F.Supp. at 925.

C. *Motions for Summary Judgment.*

Although in the civil penalty collection action brought pursuant to section 234(c) the defendant is entitled to a trial *de novo,* the defendant in this case, as well as the plaintiff, has moved for summary judgment.[12] Summary judgment is appropriate

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). This action was preceded by a full administrative hearing on the merits. That record has been certified by the proper authorities and, accordingly, may be considered by the court on these motions. *Langston v. Johnson,* 478 F.2d 915, 918 n.17 (D.C.Cir.1973); *Raitport v. National Bureau of Standards,* 385 F.Supp. 1221, 1222 (E.D.Pa.1974).

As a general proposition the NRC asserts that "viewing the facts . . . admitted by the Licensee or clearly established by competent evidence, there is no triable issue of fact left for this Court with respect to each item of noncompliance. In the main, the disputes between the Commission and the Licensee may be characterized as questions of law involving interpretations of regula-

---

11. Subsequent legislative history is most revealing. On March 20, 1979, the NRC submitted proposed legislation to modify its existing authority to impose civil penalties under section 234. Senate Report No. 96–176, accompanying S. 562, 96th Cong., 2d Sess. (1979), indicates:

The Commission's proposed legislation would modify existing law in three ways: first, the legislation would increase the maximum penalty per violation from $5,000, the present level, to $100,000. Second, the legislation would eliminate any ceiling on the amount of penalty which could be imposed for continuing violations. Third, the legislation would eliminate the opportunity under existing law for a *de novo* trial on the merits of the civil penalty before a Federal District Court.

. . . . .

The Commission also requested that it be given the authority to administratively impose and collect penalties without the opportunity for de novo trial before a Federal District Court. According to the Commission, the present system of imposing and collecting a civil penalty through action of the Attorney General in Federal district court denies the Commission full control of its enforcement action, and raises the possibility that the Attorney General will settle the action for a lower penalty than that sought by NRC. The Commission recognizes, however, that the present enforcement approach, including the opportunity for de novo trial, is typical for Federal agencies. Further, the Commission has failed to identify any instances in which the present approach has

resulted in a significant weakening of the enforcement action proposed by NRC.

The committee believes that there is considerable value in retaining the existing approach for implementing and collecting civil penalties imposed by NRC. Civil penalties are punitive sanctions, which ought to be imposed carefully and on the basis of a full adjudication on the merits of the issue. De novo review by a Federal district court provides valuable and effective means for verifying the soundness and validity of the administrative action being proposed. Accordingly, the committee recommends that the present statutory mechanism for imposing and correcting civil penalties be retained. S.Rep.No.96–176, 96th Cong., 2d Sess. *reprinted in* [1980] *U.S.Code Cong. & Ad.News* 2238–39. Section 234 was, in fact, amended in 1980 in accordance with the first and second requests of the NRC. Pub.L. 96–295, Title II, § 206, 94 Stat. 787 (1980) (codified at 42 U.S.C. § 2282(a) (Supp.1980)). Although I recognize that these statements in the Report of the Senate Environment and Public Works Committee are not binding in this action, they are, of course, indicative of congressional interpretation of NRC's civil penalty authority and should be accorded some consideration by the court.

12. Although the defendant has moved for summary judgment dismissing the complaint, I note that in its brief it actually concerns itself with arguing the existence of factual issues which allegedly preclude the grant of summary judgment to the NRC.

tory requirements." NRC's Brief at 16 (footnote omitted). The NRC then asserts that with respect to these legal issues of the construction of its rules and regulations, its views are controlling since they are consistent with both the plain meaning and underlying purposes of such rules and regulations. *Id.* The NRC also argues that the amount of the penalties assessed may not be overturned unless there has been an abuse of discretion on the part of the agency. In contrast to these assertions, RTI argues that a review of the factual circumstances leading to the investigation and alleged violations and "a review of the manner in which the administrative hearing process itself was conducted all reveal the presence of unresolved factual issues in the within action that bear directly upon the fact of the violations, as well as upon basic legal, procedural and constitutional safeguards of the defendant as a licensee." RTI's Brief at 24.

1. *The Initiation of the Investigation.*

■ The initial contention raised by RTI is that improper motivation [13] prompted the NRC's initiation of the inspection and, accordingly, the agency lacked "reason to believe" violations had been committed. Section 234(b) indicates that "[w]henever the Commission has reason to believe that a person has become subject to the imposition of a civil penalty ..., it shall notify such person in writing ..." 42 U.S.C. § 2282(b). RTI contends that a factual issue on this point precludes a grant of summary judgment to the NRC. The NRC responds to this position by arguing that section 234(b) does not limit the Commission's authority to conduct inspections.

First, I note that defendant's reliance on the Ninth Circuit's opinion in *Standard Oil Co. of California v. Federal Trade Comm'n,* 596 F.2d 1381 (9th Cir. 1979), *rev'd,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), is misplaced. Defendant cites the Circuit Court opinion for the proposition that judicial review of the determination to initiate an agency action is proper. However, defendant's argument is marred by two flaws. First, the Supreme Court reversed the Ninth Circuit and specifically reserved on the "question whether the issuance of a complaint is 'committed to agency discretion by law.'" *Federal Trade Comm'n v. Standard Oil Co. of California,* 449 U.S. 232, ——— — n.7, 101 S.Ct. 488, 492, 66 L.Ed.2d 416, 423–24 n.7 (1980). Thus, the precedential value of the Circuit Court's opinion on this issue is greatly eroded, if not negated, by the Supreme Court's reversal. Second, the weakness of this argument is recognized by the defendant itself. The defendant in fact concedes that "it could be argued here that, even if the agency's investigation resulted from outside pressures, and was unlawfully commenced, its ultimate violation notices were the result of its own findings, and the necessary 'reason to believe' determination was made." RTI's Brief at 28. I highlight that this concession by the defendant was one of the holdings of the Ninth Circuit in *Standard Oil,* 596 F.2d at 1386. In light of my determinations, *infra,* that the violations were properly cited by the NRC's inspectors, the effects of any outside influences in initiating the investigation were subsequently vitiated by the actual existence of violations.

**13.** The alleged improper motivation was detailed by the ALJ in his Opinion. He explains:

Considerable hearing time was absorbed in discussions respecting the events leading to the October 27 inspection. Events developed prior to October 27 included, what later proved to be completely groundless charges made by a newspaper reporter that excessive radiation was present in Licensee's facility, that personnel were overexposed, cancer had developed in some employees, etc. After determining that these charges were false, the Office of Inspection and Enforcement personnel decided nevertheless to undertake a thor-

ough inspection, to be additional to an inspection made in June 1976. The inspectors stated that the October inspection was made because of "public concerns reported to the Commission." No identification was given of public concerns except the false reporting made by the newspaper representative. At the hearing, the October 27 inspection was also described as a stepped up schedule based upon the June NRC inspection. *In re Radiation Technology, Inc.,* 8 N.R.C. 655, 657 n.1 (Admin. Law Judge 1978), *aff'd in part, rev'd in part,* 10 N.R.C. 533 (Atomic Safety & Licensing App. Bd. 1979).

2. *"Warrentless Search" of RTI's Premises.*

■ As previously mentioned, *supra*, RTI raised as an affirmative defense the contention that the inspections of its facilities by NRC personnel were in violation of the rules and regulations of the Commission and, therefore, the "fruits" of the inspection were inadmissible as evidence in the Commission's proceedings. A similar argument of constitutional dimension appears to have been advanced during the administrative proceedings at which time RTI asserted that the warrantless search of its premises violated its "reasonable expectation of privacy" under the fourth amendment. In support of its summary judgment motion, the NRC counters this position by asserting that the inspections were conducted with the actual consent of the licensee's plant manager and, accordingly, were proper under the fourth amendment. As an alternative argument, the NRC contends that a warrantless administrative inspection in this circumstance is constitutionally permissible. The defendant's response is limited to the contentions that the individual alleged to have given consent for the inspection was not a part of the management of the company and that any consent given was illusory since the "surprise presence of NRC inspectors flashing their badges at 7:20 a.m., was in the nature of a threat of force to this employee, when the demand for entry was made." Welt Affd. para. 7, at 5.

It is clear that the issue of RTI's employee's capacity to consent, as well as the efficacy of any consent given, are factual disputes not capable of resolution on the record presently before the court. However, summary judgment will not be precluded on this basis since I hold that this warrantless administrative investigation of RTI's premises did not contravene any constitutional restraint against unreasonable searches and seizures contained in the fourth amendment.

The Supreme Court has taught that the fourth amendment prohibition against unreasonable searches applies to administrative inspections of private commercial property. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). However, it has been recognized that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the expectation that an individual possesses in his home. *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). Most recently, the Court stated:

> The interest of the owner of commercial property is not one in being free from any inspections. Congress has broad authority to regulate commercial enterprises engaged in or affecting interstate commerce, and an inspection program may in some cases be a necessary component of federal regulation. Rather, the Fourth Amendment protects the interest of the owner of property in being free from *unreasonable* intrusions onto his property by agents of the government.

*Donovan v. Dewey*, —— U.S. ——, ——, 101 S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981) (emphasis in original). In the past, the Court has found that warrantless inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests, *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 73, 77, 90 S.Ct. 774, 775, 777, 25 L.Ed.2d 60 (1970), or if their occurrence is so random, infrequent, or unpredictable that the owner has no real expectation that his property will be inspected from time to time. *Marshall v. Barlow's, Inc., supra*, 436 U.S. at 323, 98 S.Ct. at 1825.

The regularity afforded by a warrant may be unnecessary, however, under certain inspection schemes. In *Colonnade Corp. v. United States, supra*, the Court indicated that because the alcoholic beverage industry had long been "subject to close supervision and inspection," Congress enjoyed "broad powers to design such powers of inspection ... as it deems necessary to meet the evils at hand." 397 U.S. at 76–77,

90 S.Ct. at 776–777. Likewise, in the case of *United States v. Biswell, supra,* the Court held that the Gun Control Act, 18 U.S.C. § 921 *et seq.,* established a sufficiently comprehensive and predictable inspection scheme and, thus, the warrantless inspections mandated under the statute did not contravene the fourth amendment.

The Court again addressed the propriety of warrantless administrative inspections in *Marshall v. Barlow's, Inc., supra.* In that case, the Court held that, absent consent, a warrant was required to conduct an administrative inspection under section 8(a) of the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 657(a). The OSHA imposes health and safety standards on all businesses engaged in or affecting interstate commerce that have employees. However, the Act did not tailor the scope and frequency of the inspections to the particular businesses regulated by the statute. Nor did the statute contain standards to guide inspectors in the selection of establishments to be investigated or in the exercise of their authority to inspect. Accordingly, the Court held the provision authorizing administrative searches "devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." 436 U.S. at 323, 98 S.Ct. at 1825. Thus, the Court concluded that a warrant was constitutionally required. *Id.*

The most recent and instructive case on this issue is *Donovan v. Dewey, supra.* The Court held that a warrantless administrative inspection conducted pursuant to section 103(a) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq.,* was constitutional. Initially, the Court found that Congress had expressly recognized that a warrant requirement could "significantly frustrate effective enforcement of the Act." —— U.S. at ——, 101 S.Ct. at 2540. Thus, the issue before the Court narrowed to "whether the statute's inspection program, in terms of the certainty and regularly [*sic*] of its application, provides a constitutionally adequate substitute for a warrant." *Id.* A review of the Act convinced the Court that it was "specif-

ically tailored to address . . . [health and safety] concerns, and the regulation of mines it imposes is sufficiently pervasive and defined that the owner of such a facility cannot help but be aware that he 'will be subject to effective inspection.' " *Id.* (quoting *United States v. Biswell, supra,* 406 U.S. at 316, 92 S.Ct. at 1596) (footnote omitted). Furthermore, the Act provided a specific mechanism for accommodating any special concerns that a specific mine operator might have. 30 U.S.C. § 818(a).

The Court also addressed and rejected the mineowner's contention that since stone quarries came under federal regulation in 1966, they did not have a long tradition of government regulation. —— U.S. at ——, 101 S.Ct. at 2541. The Court explained that "it is the pervasiveness and regularity of the federal regulation that ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment." *Id.* The Court noted, however, that the duration of regulation was an important factor in determining whether the regulation of the industry is sufficiently pervasive to make the imposition of a warrant requirement unnecessary. The Court's closing comments are most revealing:

> [I]f the length of regulation were the only criteria, absurd results would occur. Under appellees' view, new or emerging industries, including ones such as the nuclear power industry that pose enormous potential safety and health problems, could never be subject to warrantless searches even under the most carefully structured inspection program simply because of the recent vintage of regulation.

*Id.*

Application of the *Colonnade-Biswell* exception to the requirement of the fourth amendment, as most recently interpreted in *Donovan v. Dewey, supra,* convinces me that the warrantless administrative inspections of RTI's facilities were permissible. It is clear that the requirement of a search warrant as a predicate for conducting an administrative inspection would "signifi-

cantly frustrate effective enforcement of the Act." *Donovan v. Dewey*, —— U.S. at ——, 101 S.Ct. at 2540. The violations under consideration, *see* 1291–1301 *infra*, are so easily concealable and transitory in nature that any prior notice or delay inherent in obtaining a warrant could very possibly frustrate the success of the inspection itself. More importantly, the statutory inspection scheme provides a constitutionally adequate substitute for a warrant.

Initially, I note that the Atomic Energy Act of 1954, as amended, is specifically tailored to address the particular concerns that are unique to the utilization of nuclear material. *See* 42 U.S.C. §§ 2012, 2013. In the instant matter, the defendant is operating under a federal license granted pursuant to the Atomic Energy Act of 1954, as amended. This Act authorizes the Commission to provide for such inspections of the licensees' activities as are necessary to effectuate the purposes of the Act. 42 U.S.C. § 2201(o). The Act further charges the Commission with the responsibility of ensuring that byproduct material licensees "observe such safety standards to protect health as may be established..." 42 U.S.C. § 2111. Of course, the Commission promulgated a detailed set of regulations which dictate the manner nuclear material may be utilized and the course of conduct its licensees must follow. These regulations, in fact, are so "sufficiently pervasive and defined that the owner of such a facility cannot help but be aware that he 'will be subject to effective inspection.'" —— U.S. at ——, 101 S.Ct. at 2540 (quoting *United States v. Biswell, supra*, 406 U.S. at 316, 92 S.Ct. at 1596); *Siegal v. Atomic Energy Comm'n*, 400 F.2d 778, 783 (D.C.Cir.1968) ("a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives"). As authorized, the Commission provides for inspection of licensed material, premises and facilities of a licensee at all reasonable times [14] and for the inspection of records upon reasonable notice. 10 C.F.R. §§ 19.14(a), 30.52. The purpose of such inspections is "to ascertain compliance with [statutory] provisions ..., and regulations, orders, and licenses thereunder regarding radiological working conditions." 10 C.F.R. § 19.1. The regulations also provide for the initiation of an inspection upon the request of an employee or employee representative who believes that the Act, regulations or license conditions have been violated. 10 C.F.R. § 19.16–.17. The regulations further indicate that "[t]he licensee or licensee's representative may accompany Commission inspectors during ... phases of an inspection." 10 C.F.R. § 19.14(b).[15] Moreover,

---

**14.** 10 C.F.R. § 30.52, entitled "Inspections", provides that:

 (a) Each licensee shall afford to the Commission at all reasonable times opportunity to inspect by product [*sic*] material and the premises and facilities wherein byproduct material is used or stored.

 (b) Each licensee shall make available to the Commission for inspection, upon reasonable notice, records kept by him pursuant to the regulations in this chapter.

10 C.F.R. § 30.52; *see* 10 C.F.R. § 19.14(a). The initial unannounced inspection of RTI's facilities by the Commission inspectors began at approximately 7:30 a.m. on October 27, 1976. It is the contention of RTI that the inspection violated the Commission's regulations in that it was conducted at an "unreasonable" time. Specifically, RTI contends that the inspection was unreasonable since it began prior to normal business hours at a time when senior management personnel were not present at its facility. It is undisputed, however, that immediately prior to the start of the inspection, the licensee was conducting licensed activities and that byproduct material was being utilized by the "night shift" employees. The reasonableness of the timing of the inspection cannot be determined in a void. Consideration must be given to the purpose of such inspections. While the potential for radiation exposure exists at all times, such danger is particularly acute whenever licensed material is being utilized by employees. Since "such hazards are not confined to 'office hours,' neither may Commission inspections be limited to those times." *In re Radiation Technology, Inc.*, 10 N.R.C. 533, 540 (Atomic Safety & Licensing App. Bd. 1979). Thus, I hold that the inspections conducted in this matter were "reasonable" within the meaning of that limitation in the regulations.

**15.** As indicated above, 10 C.F.R. § 19.14(b) states: "The licensee or licensee's representative may accompany Commission inspectors

the standards with which a licensee is required to comply are all specifically set forth in the Act or in Title 10 of the Code of Federal Regulations. Thus, although the Commission's inspectors may exercise somewhat more discretion than the federal mine inspectors in *Donovan v. Dewey, supra,* a review of the regulatory scheme under the Act convinces me that the Act establishes "a predictable and guided federal regulatory presence." —— U.S. ——, 101 S.Ct. at 2541. Moreover, although the duration of federal regulation of the nuclear industry is necessarily short, the "pervasiveness and regularity of the federal regulation" persuades the court that a warrant is not necessary to render this inspection program reasonable under the fourth amendment. Finally, the court is encouraged to make this determination in light of the specific reference in *Donovan v. Dewey,* —— U.S. at ——, 101 S.Ct. at 2542, to the nuclear power industry and the inference made therein to the propriety, under the proper regulatory scheme, of warrantless searches in that industry. Since the inspection was permissible, the fruits of that inspection were properly before the Commission, as well as this court.

### 3. *The Violations.*

■ After the inspection, a Notice of Violation was issued to RTI, in which the Commission asserted that certain activities of the licensee were not in full compliance with NRC regulations and license conditions. I will now discuss each of these alleged violations as they were set forth in the Notice.[16]

### (a) *Item One.*

Item One of the Notice asserted that RTI failed to advise the Commission of contamination of its R&D pool water as required by License Condition 13. It is undisputed that an analysis of a 100 milliliter sample of the pool water, taken on September 2, 1975, and on September 3, 1975, revealed 0.13 microcurie of removable contamination. It is also undisputed that the licensee failed to report this information to the Commission within five days. Both parties agree that the resolution of the propriety of this alleged violation rests upon an interpretation of the language of the license condition. License Condition 13 states:

A. Each sealed source containing licensed material shall be tested for leakage and/or contamination at intervals not to exceed six months. In the absence of a certification from a transferor indicating that a test has been made within six months prior to the transfer, a sealed source received from another person shall not be put into use until tested.

B. The tests shall be capable of detecting the presence of 0.05 microcurie of contamination on the test sample. The test shall be in accordance with the procedures and representations contained in Item 11, of Table II, revised November 17, 1970, and Item H. of Supplemental Information submitted with letter dated November 3, 1970. Records of leak test results shall be kept in units of microcuries

during ... phases of an inspection." 10 C.F.R. § 19.14(b). In the proceedings before the Commission, RTI asserted that, absent prior notice, initiation of an inspection during times other than normal office hours of its management officials violated its "walk-around" right under 10 C.F.R. § 19.14(b). It renews this assertion at the present time.

This argument must be rejected. Prior notice of an inspection, whenever scheduled, is not required by either statute or regulation. Given the continuous nature of radiation hazards and the licensee's duty to safeguard against these hazards, a licensee cannot attack the propriety of an inspection on the basis of its own failure to adequately staff its operation. The licen-

see's "walkaround" privilege under 10 C.F.R. § 19.14(b) is not a condition of the Commission's obligation to inspect the premise. Rather, it is an accommodation to the licensee which permits the licensee under certain circumstances to assist inspectors during their on-site evaluation of the licensee's compliance with the Act, regulations and license conditions. *See* 10 C.F.R. §§ 19.14(b), (g), .15.

16. The numerical ordering of the violations as found in the Notice of Violation and in the complaint differs. For the purpose of clarification, reference in this opinion is to the itemization as contained in the Notice.

and maintained for inspection by the Commission.

C. If the test reveals the presence of 0.05 microcurie or more of removable contamination, the licensee shall immediately withdraw the sealed source from use and shall cause it to be decontaminated and repaired or to be disposed of in accordance with Commission regulations. A report shall be filed within 5 days of the test with the U.S. Nuclear Regulatory Commission, ... describing the equipment involved, the test results, and the corrective action taken.

D. Tests for leakage and/or contamination shall be performed by the licensee or by other persons specifically authorized by the Commission or an Agreement State to perform such services.

It is the contention of the NRC that the pool water sample was a "leak test", triggering the reporting requirement. In contrast, the defendant, although conceding that a pool sample is part of a leak detection, RTI's Brief at 36, asserts that "[l]eak tests are tests to isolate a specific leaker. Pool water tests are one consideration in determining whether to perform leak tests." *Id.* at 33.

█ It is hornbook law that an agency's interpretation of its own regulations are entitled to great weight. Unless its interpretation is plainly erroneous or inconsistent with the regulations, the agency's interpretation is controlling. *Northern Indiana Public Serv. Co. v. Walton League*, 423 U.S. 12, 14–15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975). Although the reporting requirement at issue here is not embodied in any regulation, the condition operates in the same manner as a regulation and should be construed similarly. The Commission's determination that the 100 milliliter sample of pool water was a "leak test" within the meaning of Condition 13 is both reasonable and consistent with the plain meaning of the condition. The interpretation urged by the NRC is buttressed by a review of Item 11 of Table II and Item H of the Supple-

mental Information, incorporated by reference into the condition. Both Items are replete with reference to pool water samples as the procedure to be employed for the required periodic testing. Accordingly, the court holds that the NRC is entitled to summary judgment as to the existence of the violation alleged in Item One.

(b) *Item Two.*

Item Two of the Notice asserted that RTI failed to notify the Commission, as required by 10 C.F.R. § 20.403(b)(3), of a shutdown of its R & D pool for a period of more than one day. Again, it is undisputed that the employees of RTI detected an increasing rate of activity in the R & D pool on September 2, 1975. Pool operations were terminated that same day and remained shutdown until September 10, 1975. Furthermore, it is evident that the licensee failed to notify the Commission within twenty-four hours of the shutdown. Thus, the NRC asserts that nothing further is required to establish a violation of the regulation. The defendant, however, contests the NRC's interpretation of the regulation and alleges that the shutdown was caused by clarity problems, *i. e.,* clouding of the pool water, and not by an "incident" reportable under the regulation.

The regulation in question, 10 C.F.R. § 20.403(b)(3), states:

(b) *Twenty-four hour notification.*
Each licensee shall within 24 hours notify by telephone and telegraph, mailgram, or facsimile, the Director of the appropriate NRC Regional Office ... of any incident involving licensed material possessed by him and which may have caused or threatens to cause:

(1) Exposure of the whole body of any individual to 5 rems or more of radiation; exposure of the skin of the whole body of any individual to 30 rems or more of radiation; or exposure of the feet, ankles, hands, or forearms to 75 rems or more of radiation; or

(2) The release of radioactive material in concentrations which, if averaged over a period of 24 hours, would exceed 500

times the limits specified for such material in Appendix B, Table II; or

(3) A loss of one day or more of the operation of any facilities affected; or

(4) Damage to property in excess of $2,000.

*Id.* A concession by the defendant, however, proves fatal to its position. Although arguing that the shutdown was due to clarity problems, the defendant "admits the radiation levels were rising at the time the pool operations were shut down, . . ." RTI's Brief at 39. This admission when considered in conjunction with the broad reporting standards contained in the regulation proves too much. Defendant emphasizes the importance of a shutdown due to an "incident involving licensed material." The emphasis should properly be placed on the minimal causal connection required by the regulation between an incident and the reporting requirement. The regulation requires reporting an incident "which *may* have caused or *threatens* to cause" a shutdown. 10 C.F.R. § 20.403(b) (emphasis added). Certainly, the undisputed rise in radioactivity in the pool "may have caused or threaten[ed] to cause" the shutdown.

█ Furthermore, the justification offered by the defendant for not reporting the shutdown does not establish a genuine issue of material fact which would preclude the entry of summary judgment on this item. A genuine issue of material fact must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Absent any probative evidence tending to support the claim, mere assertions of a dispute will not preclude summary judgment. *Id.* at 290, 88 S.Ct. at 1593. Since the proponent of the "cloudy water" theory by his own admission was neither present at the shutdown nor knew the identity of the individual who ordered the shutdown, Tr. 1991–23, the allegation of cloudy water does not preclude the entry of summary judgment.

Accordingly, the court will grant the NRC's motion for summary judgment as to the existence of the violation set forth in Item Two.

(c) *Item Three.*

Item Three of the Notice asserted that RTI failed to comply with a NRC regulation which requires that all individuals working in a restricted area be instructed in the precautions used to minimize radioactive exposure. Again, certain facts are undisputed. It is clear that two employees of RTI carried personnel monitoring equipment, *i. e.*, film badges, in their wallets in back pockets out of their proper holders. RTI's Radiation Safety Officer at the time was not aware of this practice. The NRC contends that these facts establish a violation of the regulation. In contrast, RTI argues that there is insufficient evidence to support the allegations of the violation and, assuming that the allegations are supportable, they do not give rise to a citable offense.

10 C.F.R. § 19.12 provides:

All individuals working in or frequenting any portion of a restricted area shall be kept informed of the storage, transfer, or use of radioactive materials or of radiation in such portions of the restricted area; shall be instructed in the health protection problems associated with exposure to such radioactive materials or radiation, in precautions or procedures to minimize exposure, and in the purposes and functions of protective devices employed; shall be instructed in, and instructed to observe, to the extent within the worker's control, the applicable provisions of Commission regulations and licenses for the protection of personnel from exposures to radiation or radioactive materials occurring in such areas; shall be instructed of their responsibility to report promptly to the licensee any condition which may lead to or cause a violation of Commission regulations and licenses or unnecessary exposure to radiation or to radioactive material; shall be instructed in the appropriate response to

warnings made in the event of any unusual occurrence or malfunction that may involve exposure to radiation or radioactive material; and shall be advised as to the radiation exposure reports which workers may request pursuant to § 19.13. The extent of these instructions shall be commensurate with potential radiological health protection problems in the restricted area.

*Id.* The use of personnel monitoring equipment is also detailed by regulation. Specifically, 10 C.F.R. § 20.202 provides:

(a) Each licensee shall supply appropriate personnel monitoring equipment to, and shall require the use of such equipment by:

(1) Each individual who enters a restricted area under such circumstances that he receives, or is likely to receive, a dose in any calendar quarter in excess of 25 percent of the applicable value specified in paragraph (a) of § 20.101.

. . . . .

(3) Each individual who enters a high radiation area.

(b) As used in this part,

(1) "Personnel monitoring equipment" means devices designed to be worn or carried by an individual for the purpose of measuring the dose received (e. g., film badges, pocket chambers, pocket dosimeters, film rings, etc.);

. . . . .

*Id.* Thus, although it is agreed that film badges are required to be utilized, the licensee contends that the regulation is silent as to where the badge shall be worn. Thus, carrying the badge in one's pocket is not a violation. However, 10 C.F.R. § 20.202 indicates that the licensee shall supply the personnel monitoring equipment and require the use of such equipment as "designed."

It is evident from the record before the court, including RTI's own admissions, that RTI violated 10 C.F.R. § 19.12. The licensee admitted that it did not instruct its employees as to where to wear the film badges. Tr. 42–43. The licensee only instructed the employees that the film badges

were to be worn. Tr. 43. The "designed" use of the film badges is gleaned from the brochure provided to the licensee by Dosimetry Service, the manufacturer of the badges. The brochure explains that "[i]t is important to realize that the film used is X-ray film and should be handled with the same care given to the most sensitive photographic film. Any exposure to excessive heat, humidity, or undue pressure will affect the film and could make it uninterpretable." More important, however, are the instructions for wearing the badges.

The badges should be worn at the location where the maximum exposure on the body is expected. The badge should be completely uncovered and facing the radiation source (not at an angle). Any object placed between the badge and the radiation will affect the readings and destroy the accuracy of dose determination. Most users wear the badges on the chest pocket but some wear them on their collars because maximum exposure is to the eyes. Some states require badges be worn on the collar.

McClintock Statement, Attachment 7, at 4 (following Tr. 107). Therefore, RTI violated 10 C.F.R. § 19.12 by failing to instruct its employees where to wear the badge, a precaution necessary to minimize exposure to radioactive materials or radiation. Accordingly, the Commission is granted summary judgment with respect to the existence of the violation listed as Item Three.

(d) *Item Four.*

Item Four of the Notice alleges that the licensee violated 10 C.F.R. § 20.105(b). This regulation establishes the permissible levels of radiation that may be present in unrestricted areas. The inspectors asserted that on October 27, 1976, they monitored levels of radiation in unrestricted areas in excess of that permitted. In particular, they obtained a reading of 95mR/hr on the surface of a steel container outside the door leading into the mechanical room and 40 mR/hr on the surface of a 55-gallon drum, containing contaminated recirculation water, outside the overhead door leading into the warehouse connected to the office

building. However, the ALJ found that "[t]his alleged noncompliance rests upon a survey meter whose accuracy has not been established, and thus there is not reasonable, probative, and substantial evidence to support the proposed civil penalty. . . ." *In re Radiation Technology, Inc., supra,* 8 N.R.C. at 669 (footnote omitted). On appeal, the Commission asserted that the licensee had conceded the violation below and the imposition of the penalty need not rest upon the inspectors' evidence. The Appeal Board rejected this argument and affirmed the ALJ's determination. *In re Radiation Technology, Inc., supra,* 10 N.R.C. at 549–50. Before this court, the NRC has not sought collection on Item Four and, thus, I need not address the propriety of this citation.

(e) *Item Five.*

Item Five alleges that RTI violated a NRC regulation which requires that licensed materials, stored in an unrestricted area, be secured against unauthorized removal from the place of storage. The Notice specifically indicated that contrary to the regulation "on October 27, 1976, radioactive material described in Item 4 existed in the unrestricted area outside of your facility and was neither secured against unauthorized removal nor under constant surveillance and immediate control." The ALJ rejected this citation on two grounds. First, since Item Five made reference to the radioactive material in Item 4, the ALJ determined that the staff's failure to prove the specific radiation levels in connection with Item Four precluded judgment on Item Five as well. Second, the ALJ decided that the licensee had maintained sufficient control over these containers since as landlord and employer it exercised control over both the general public and employees. Furthermore, the ALJ found that the licensee posted an employee in a glass-enclosed area "which permitted him to see the object containing some radioactive material at all times." 8 N.R.C. at 670.

The Appeal Board reversed the determination of the ALJ. Addressing the ALJ's ruling that reference to Item Four material was fatal, the Appeal Board explained:

The regulation in question, 10 C.F.R. 20.207(b), provides that:

Licensed material in an unrestricted area and not in storage shall be tended under the constant surveillance and immediate control of the licensee.

. . . The record evidence is undisputed that the two receptacles contained "licensed material" and were located in an "unrestricted area". Section 20.207 does not make the emission of any particular level of radiation an element of the offense and the reference in charge 5 of the Notice of Violation to "the radioactive material described in Item 4" does not import such a requirement. Fairly read, the charge simply refers to the earlier description in order to particularize the receptacles asserted to have been improperly controlled by the company.

10 N.R.C. at 551 (footnotes omitted). With respect to the interpretation of "constant surveillance and immediate control", the Appeal Board ruled that such surveillance and control required more than exclusive occupancy of the building.

As a factual basis for this holding, the Appeal Board explained:

The record does not support the trial judge's finding that both [receptacles] were continuously visible from the plant manager's office (8 NRC at 670). In the first place, according to the manager himself, one of them was not. [*Powell,* Tr. 313] In the second, actual and continual observation, not possible and intermittent oversight, is prescribed by Section 20.207. Neither the manager nor any other employee was assigned or expected to keep the drum and container with the radioactive waste materials under continuous observation; there is no evidence in the record that anyone actually did so; and the inspectors testified that the two receptacles were neither under constant surveillance and immediate control nor secured against unauthorized removal on the day of their inspections. [*Powell,* Tr. 315; *Smith,* Tr. 107, at 7;

*McClintock,* Tr. 107, at 6] ... Radiation Technology's representative acknowledged expressly that (Tr. 55):

The company agrees with the NRC in the fact that the items cited in 4(b) was (*sic*) in an unrestricted area and was (*sic*) not under constant surveillance and immediate control of the licensee.

10 N.R.C. at 552 (footnotes omitted).

The parties make the same arguments here as were made before the administrative body. In addition, however, RTI contends that "the steel container referred to in this allegation contained nothing more than trash, and did not contain 'licensed material', as alleged." RTI's Brief at 50.

The present contention of RTI that the receptacles did not contain "licensed material" is a bold and unsupported assertion which does not raise a material factual issue which precludes summary judgment. First, the present allegation was made in an unverified document, *i. e.,* defendant's brief. The affidavit of Welt filed by the defendant in opposition to the Commission's motion is devoid of any averment that the material contained in these receptacles was not "licensed material." Second, a review of the administrative record clearly reveals that this assertion is directly contrary to the evidence presented to the agency by the licensee. Tr. 37, 48, 49, 51, 52, 56. With respect to the arguments made before the Commission and reiterated here, I find most persuasive the Appeal Board's reasoning. Although, of course, the holding of the Appeal Board is not binding upon this court, judicial economy is admirably served by adopting the Appeal Board's reasoning. Accordingly, the Commission is granted summary judgment as to the existence of the violation set forth in Item Five.

(f) *Item Six.*

Item Six alleges that RTI failed to conspicuously post radiation areas in violation of 10 C.F.R. § 20.203(b) and failed to post and control access to a high radiation area in violation of 10 C.F.R. § 20.203(c). More specifically, it is alleged that:

a. ... the east side double doors leading into the R&D room and the east and west doors leading into the receiving pool room were not posted as a radiation area.

b. ... access was not controlled to the high radiation area which existed in the receiving pool since approximately November 12, 1975, and the area was not posted as a high radiation area.

Notice of Violation. The validity of these asserted violations was affirmed by both the ALJ and the Appeal Board.

RTI argues that the Commission failed to prove the existence of radiation areas requiring posting and, assuming the areas were radiation areas, that the actual posting was sufficient. The failure to prove the existence of radiation areas allegedly stems from the unproven reliability of the survey instruments recognized in Item Four. The defendant also asserts that the evidence adduced before the Commission proves that the access to the high radiation area was controlled.

If the Commission were forced to rely upon the inspectors' surveys to establish the existence of radiation and high radiation areas, I would agree that a factual issue would exist with respect to this alleged violation. However, independent evidence establishes these facts. Initially, I note that the regulation defining "radiation area" and "high radiation area" is not concerned with the precise level of radiation measured on a given day. Rather, the need for cautionary signs is triggered by the possibility that the permissible dosage of radiation "could" be exceeded. 10 C.F.R. § 20.202(b)(2) and (3). Secondly, the defendant concedes that the bottom of the receiving pool "has levels of radiation sufficient to amount to a high radiation area." RTI's Brief at 56. Thirdly, with respect to the R&D pool room, the descriptive information contained in RTI's license application belies the present assertion that this area is not a radiation area. In describing the facility's operations, RTI states "[t]he R & D room is a controlled area and access is

restricted to authorized personnel." Application for Byproduct Material License sec. 2, at 5 (Attachment 15 to McClintock Statement, following Tr. 107) (hereinafter cited as "Application"). RTI indicates that "[t]he standard 'CAUTION RADIATION AREA' will be posted at the interior and exterior entrances to the R & D room and on the roof." Application, *supra*, sec. 2, at 7. Furthermore, "[a] standard 'CAUTION–RADIOACTIVE MATERIAL' sign will be posted . . . on the wall in the vicinity of the R & D pool." *Id.* A similar representation is found in that portion of the Application specifically describing the pool irradiator. *Id.* sec. 3, at 3. RTI indicates in its Application that the radiation warning signs "shall be posted in accordance with 10 CFR Part 20." *Id.*, Table II, at 2. Finally, in the Supplemental Information provided by RTI for its license, RTI explains that the R & D area "is considered to be a restricted area." Supplemental Information at 1 (Attachment 17 to McClintock Statement, following Tr. 107). In light of the evidence detailed above, the court holds that the R & D room and the receiving pool area are "radiation" and "high radiation" areas, respectively, within the meaning of the regulation. The defendant's unverified present assertion that such areas are not so does not raise a material issue of fact.

Once this threshold is crossed, the validity of the violation is apparent. 10 C.F.R. § 20.203(b) and (c) require that the warning signs be "conspicuously posted." The licensee indicated that the signs were affixed to the doors themselves. However, since the doors were normally open, the licensee admitted that the signs "were there but not exposed." Tr. 76–17, 77. Furthermore, the observations of the NRC inspectors were that the double doors leading into the R & D room were open and could not be closed due to damaged hinges. The inspectors also indicated that no signs were posted on the east and west entrance doors of the receiving room. R. Smith Statement at 7 (following Tr. 107); R. McClintock Statement at 7 (following Tr. 107). These statements are not denied by the licensee.

The failure of the defendant to control access to the high radiation area of the receiving pool is also evident from the record before the court. The defendant conceded that the double doors into the R & D pool room were left open a majority of the time during operational hours. Furthermore, no barrier existed between the R & D pool room and the receiving pool room. Moreover, access to the bottom of the receiving pool itself, an admitted high radiation area, was controlled merely by the removal of a wooden extension ladder. Certainly, these controls of the access to the high radiation area do not comport with the specific requirements of 10 C.F.R. § 20.203(c)(2).

Accordingly, for the reasons set forth above, I will grant the Commission summary judgment with respect to the existence of the violations set forth in Item Six.

(g) *Item Seven.*

 Item Seven alleges that RTI violated 10 C.F.R. § 20.203(f) by not labeling "the containers of radioactive material located in the receiving pool room and the containers of material located in the unrestricted area discussed in Items 4.a and 4.b" to identify their radioactive content. 10 C.F.R. § 20.203(f) requires that

(1) . . . each container of licensed material shall bear a durable, clearly visible label identifying the radioactive contents.

(2) A label required pursuant to paragraph (f)(1) of this section shall bear the radiation caution symbol and the words "CAUTION, RADIOACTIVE MATERIAL" or "DANGER, RADIOACTIVE MATERIAL". It shall also provide sufficient information to permit individuals handling or using the containers, or working in the vicinity thereof, to take precautions to avoid or minimize exposure.

*Id.* (footnote omitted). There are, however, certain exceptions to the labeling requirement. In pertinent part, the exceptions are:

(i) For containers that do not contain licensed materials in quantities greater than the applicable quantities listed in Appendix C of this part.

.　　.　　.　　.　　.

(iii) For containers that do not contain licensed materials in concentrations greater than the applicable concentrations listed in Column 2, Table I, Appendix B of this part.

.　　.　　.　　.　　.

10 C.F.R. § 20.203(f)(3)(i), (iii).

The defendant makes several arguments in opposition to the NRC's motion for summary judgment as to this item of noncompliance. First, the defendant asserts that the containers noted in the citation fall within the exceptions quoted above, removing the necessity of labeling. Second, RTI contends that the labeling it utilized complied with the regulation requirements.

Defendant's second assertion is easily dispatched. The testimony presented by the licensee indicates that the labeling was in the form of red and black grease pencil markings. These markings were penciled "X"s on the containers with radioactive readings written next to the Xs. Compliance was also alleged in the form of radiation warning signs propped up next to one of the containers. It is clear that these labelings are not in compliance with the regulation. The regulation requires each container to bear a label of a specified nature so as to permit workers handling the containers to take precautionary measures. No mention whatsoever is made to grease pencil markings. Nor do such markings fulfill the intent of the regulation. Furthermore, the requirement that each container "bear" a label negates any inference that a sign propped up against a container is proper labeling. Accordingly, I reject these arguments of RTI.

I do, however, find persuasive RTI's argument that the NRC failed to prove that the containers were not excepted from the labeling requirements. Two exceptions to the labeling requirement are based upon the quantities and concentrations of li-censed materials contained within the containers. 10 C.F.R. § 20.203(f)(3)(i) and (iii). It is clear that the predicate for this citation was the surveys of these containers performed by NRC inspectors. R. Smith Statement Enclosure B at 9 (following Tr. 107); R. McClintock Statement at 8 (following Tr. 107). In affirming this citation, the ALJ merely discussed the attempted labeling by the licensee and found it insufficient. 8 N.R.C. at 671–72. Likewise, the Appeal Board's opinion is devoid of any mention of this argument. 10 N.R.C. at 545. The Commission has not argued before this court that the determination of the ALJ, as affirmed by the Appeal Board, that the survey instruments used by the NRC inspectors were not verified as accurate was erroneous. Such argument would be futile in light of the evidence adduced before the ALJ and the ALJ's well-reasoned opinion thereon. 8 N.R.C. at 663–66. Accordingly, the court finds that the alleged noncompliance set forth in Item Seven is unsupportable and must be dismissed. Like Item Four, this violation rests upon consideration of the accurate measurements of licensed material, not the mere existence of licensed material.

(h) *Item Eight.*

Item Eight asserts that RTI failed to make certain "surveys" required by 10 C.F.R. § 20.201. This regulation states:

(a) . . . "survey" means an evaluation of the radiation hazards incident to the production, use, release, disposal, or presence of radioactive materials or other sources of radiation under a specific set of conditions. When appropriate, such evaluation includes a physical survey of the location of materials and equipment, and measurements of levels of radiation or concentrations of radioactive material present.

(b) Each licensee shall make or cause to be made such surveys as may be necessary for him to comply with the regulations in this part.

*Id.* Four specific incidents of noncompliance are alleged.

First, it is alleged that RTI failed to make the surveys necessary to comply with 10 C.F.R. § 20.105. "Specifically, the surveys which were made were inadequate in that they failed to detect actual levels in excess of those permitted as noted in Items 4.a and 4.b." As expected, the defendant asserts that the reference in Item Eight to the "actual levels" of radiation noted in Item 4(a) and (b) precludes judgment on this item. I agree that if the Commission relied on the "actual levels" of radiation noted in Item Four (a) and (b), then the cited violation could not stand. The "actual levels" in Item Four (a) and (b) are unverifiable and thus not a basis for the violation. However, the Commission construed the regulation in terms of the necessity of conducting surveys, not "the particular level that may be determined." 8 N.R.C. at 672; 10 N.R.C. at 546. Thus, I reject the defendant's contention that this allegation of noncompliance must fall due to the instrumentation employed by the NRC. However, I accept the defendant's alternative proposition on this issue. It is undisputed that RTI's Vice President of Operations had conducted a survey of these items, although RTI does admit that it missed a "hot spot" on one of the containers. In light of the questionable foundation for the violation cited in Item Four and the licensee's good faith attempt to comply with the survey requirement, I hold that the evidence before the court is insufficient to support the citation in Item Eight (a). Accordingly, Item Eight (a) will be dismissed.

Second, it was alleged that RTI failed to make the surveys required to assure compliance with 10 C.F.R. § 20.101(a). "Specifically, there were no surveys made to determine the radiation exposure to individuals in the restricted area, including two individuals who removed the film from their film badge holder, discarded the holder, and placed the film in their billfold." In opposition to this allegation of noncompliance, RTI contends that there is no evidence that the maximum exposure limits set in 10 C.F.R. § 20.101(a) were ever exceeded. Furthermore, as a technical point, RTI argues that the film badge requirement is contained in 10 C.F.R. § 19.12. Since this requirement is not contained in Part 20 of the regulatory scheme, RTI contends the film badge requirement is not within the survey requirement contained in 10 C.F.R. § 20.201(b), which necessitates compliance "with the regulations in this part [Part 20]."

The defendant's arguments are without merit. First, as mentioned above, the surveys of 10 C.F.R. § 20.201 are evaluations conducted of the potential radiation hazards, not the results obtained from those evaluations. The NRC's failure to prove radiation levels in excess of those permitted in 10 C.F.R. § 20.201(a) is not germane to the determination of whether the proper surveys were conducted to obtain those measurements. The NRC need only prove that the surveys were not conducted or, if conducted, they were performed so improperly so as to not comply with the applicable regulation. My earlier determination that the Item Three citation was proper establishes that the survey conducted by the licensee was so improperly conducted as to not comply with 10 C.F.R. § 20.202. Second, defendant's technical argument is simply incorrect. The requirement for personnel monitoring devices, i. e., film badges, is contained in 10 C.F.R. § 20.202, not 10 C.F.R. § 19.12. 10 C.F.R. § 20.202 is a regulation in Part 20 and thus within the ambit of 10 C.F.R. § 20.201. Accordingly, I will grant the NRC's motion for summary judgment as to the existence of the violation set forth in Item Eight (b).

Third, it is alleged that RTI failed to survey radioactive material that had been discharged in liquid effluents into an unrestricted area contrary to 10 C.F.R. § 20.106. "Specifically, there were no surveys made of contaminated water discharged via the floor drain in the R & D pool room to the leaching field . . . ." In pertinent part, 10 C.F.R. § 20.106 indicates that:

(a) A licensee shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix "B", Table II

of this part, . . . For purposes of this section concentrations may be averaged over a period not greater than one year.

. . . . .

(d) For the purposes of this section the concentration limits . . . shall apply at the boundary of the restricted area. The concentration of radioactive material discharged through a . . . pipe or similar conduit may be determined with respect to the point where the material leaves the conduit.

. . . . .

10 C.F.R. § 20.106(a), (d). In opposition to this citation, RTI contends that the NRC inspectors failed to conduct a thorough inspection of the area since they did not average the readings and failed to mention the existence of a separate water pump used to dilute drainage. RTI also contends that the periodic pool surveys satisfy the regulation since the pool water is the main source of the drainage. I note that the initial considerations raised by the defendant are irrelevant under the regulation. The periodic pool surveys do not provide the data applicable to 10 C.F.R. § 20.106(d). The surveys are not conducted at "the point where the material leaves the conduit" as directed by the regulation. Furthermore, the licensee conceded before the ALJ that it "agree[d] to the fact that direct surveys were not made of water discharged at all times by the floor drain of the R & D room." Tr. 47. Accordingly, the Commission is entitled to summary judgment with respect to the existence of the violation set forth in Item Eight (c).

Fourth, it is alleged that RTI failed to make surveys necessary to assure compliance with 10 C.F.R. § 20.301. "Specifically, surveys were not made of material disposed of by placing them in a container (dumpster) in the unrestricted area for subsequent disposal as normal trash." The defendant asserts that no evidence was presented from which it could be concluded that the radioactive material would be disposed of prior to a proper survey. "There is absolutely no evidence that defendant was not going to bury the dirty material, or evidence that surveys would not be done prior to disposal, if disposed as garbage." RTI's Brief at 66.

Initially, it should be highlighted that the defendant admitted that contaminated material was in a dumpster located outside its facility in an unrestricted area. Tr. 48. Again, RTI's affidavit in opposition to this motion is devoid of any averment that the method of disposal would be burial. In fact, at the hearing RTI only asserted that the dumpster itself would be surveyed "prior to being emptied by the trash pickup concern." Tr. 48. Furthermore, RTI's Application specifically addressed the manner of disposal for radioactive waste. At that time, RTI indicated "[t]here are no solid . . . wastes anticipated. Should any of these be developed, however, they would be stored in separate containers and properly tagged for eventual shipment from the site." Application, *supra*, sec. 2, at 7. Certainly, the radioactive rag found in the dumpster was not being stored nor was it properly tagged. Finally, it is clear to the court that material once placed in a commercial dumpster is "disposed" within the meaning of the regulation and not awaiting disposal as contended by defendant. Accordingly, the court will grant the NRC summary judgment with respect to the existence of the violation set forth in Item Eight (d).

(i) *Item Nine.*

Item Nine asserts that RTI failed to comply with License Condition 12 since "byproduct material had been routinely used by and under the supervision of an individual other than those designated by the license condition." License Condition 12 lists five RTI personnel as authorized supervisors during the utilization of the licensed material. With respect to this alleged violation, the defendant concedes its existence but argues that mitigating circumstances should void the penalty imposed. RTI contends that the authorization is merely a clerical check on the training of employees and that the employee in question was qualified and subsequently authorized. Since

this violation is the second of its kind, I find the defendant's arguments for mitigation unpersuasive. Summary judgment is granted to the NRC with respect to the existence of the violation set forth in Item Nine.

### 4. *Penalties Assessed.*

Since the agency's imposition of monetary penalties involves a different process from the determination of noncompliance, different standards of review are necessarily employed. The imposition of monetary penalties and the severity of sanction involves the exercise of the agency's discretionary power. The agency's assessment of penalties will not be overturned unless it is "unwarranted in law ... or without justification in fact." *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1457–58, 36 L.Ed.2d 142 (1973).

Although section 234 provides no mandatory factors for the Commission to consider in imposing penalties or the amounts thereof, the Commission has adopted a policy of considering civil monetary penalties where items of noncompliance represent a threat to the health, safety or interests of the public. Office of Inspection & Enforcement Manual § 0815.01 (following Tr. 107). Monetary penalties are also deemed appropriate in instances of repeated noncompliance. *Id.* § 0815.02. It has been established that Items Five and Nine in this matter were repetitive instances of noncompliance with the regulation and license condition. Furthermore, the record supports a determination that the other items represent a threat to the health, safety and interests of the public such that penalties are also proper.

With respect to the amount of the penalties imposed, the Commission's actions are likewise authorized by law and warranted by the facts. The penalties for each item all are within the statutory range authorized by section 234. In order to ensure that the actual penalty imposed is reasonably related to the violation the Commission determines the amount of each penalty based on the type of license, actual or potential severity of the items of noncompliance and certain judgment factors, including the number of items of noncompliance, past performance, and subsequent corrective action. *Id.* § 0855 *et seq.* In the case of RTI, the penalty assessed for Items One, Two, Three, Six and Eight all constitute the minimum authorized penalty. The penalty assessed on Items Five and Nine was mid-range in light of the repetitive nature of the noncompliance. I find that the imposition of penalties by the NRC as well as the amounts thereof was within the proper exercise of the agency's discretion. Accordingly, the court will grant the NRC summary judgment as to the penalties imposed on Items One, Two, Three, Five, Six, Eight (b), (c) and (d) and Nine. The violations set forth in Items Seven and Eight (a) are dismissed.

The NRC shall submit an order in conformity with this opinion, with consent as to form, within ten days.